## WALLACE *v.* LINCOLN SAVINGS BANK.

## (*Nashville.* February 14, 1891.)

1. CORPORATIONS. *Action against directors for loss to corporation caused by their negligence. Recovery for benefit of all share-holders.*

In suit against officers or directors of a corporation for losses caused by their neglect and mismanagement of the corporate affairs, whether it is prosecuted by the corporation itself, or, in a proper case, by a creditor or share-holder thereof, the recovery therein inures to the benefit of the corporation—all its creditors and share-holders, innocent and guilty, sharing therein according to their respective rights. (*Post, pp. 634, 635.*)

2. SAME. *Same. By whom and in what Court maintainable.*

Primarily such suit is maintainable at law and by the corporation alone. But share-holders and creditors can maintain it, in a Court of Equity, when the corporation is disabled to sue, or wrongfully refuses, upon proper demand, to do so, but not otherwise. (*Post, pp. 634, 635.*)

3. SAME. *Same. Demand to sue, of whom made.*

Before a creditor or share-holder can maintain such suit he must, in the case of a going corporation that is not disabled to sue, prefer his demand for the bringing of suit to the board of directors, not to the president alone, of the corporation; and, in case of an insolvent corporation that has made a general assignment, the demand must be made of the assignee. (*Post, pp. 634–636.*)

Cases cited and approved: Hume *v.* Bank, 9 Lea, 744; 37 N. J., 273; 86 Ky., 530; 87 Ky., 306; 88 N. Y., 52.

4. SAME. *Same. Discretion as to refusal to sue.*

The board of directors possess large discretion, and their refusal, in good faith, to bring such suit, will rarely be overruled by the Courts at the instance of a creditor or share-holder of the corporation. The assignee of an insolvent corporation has a more limited discretion in this matter. (*Post, pp. 636–638.*)

5. SAME. *Same. No recovery of dividends improperly paid.*

There can be no recovery, by or on behalf of share-holders in such suit, for dividends improperly declared and paid out to the share-holders themselves. (*Post, p. 641.*)

Case cited: L. R. Ch. Cases, Vol. IV., p. 582.

6. SAME. *Same. Statute of limitations applicable.*

And such suit, whether brought at law by the corporation itself, or in equity by a creditor or share-holder for its benefit, is alike subject to the bar of the statute of limitations. (*Post, pp. 648–650.*)

Cases cited and approved: Hughes·*v.* Brown, 88 Tenn., 578; 71 Penn. St., 11; 11 Ala., 191; 38 N. J. Eq., 383; 99 N. Y., 193.

Cited and distinguished: Shea *v.* Mabry, 1 Lea, 319.

7. SAME. *Same. What statute of limitation applicable.*

The statute of limitations of six, not of three, years is applicable to suits of this particular description. The suit is not for injury to or conversion of property, but upon the directors' implied contract that they will exercise ordinary diligence in the discharge of the duties of their office. (*Post, pp. 650, 651, 655.*)

Code construed: §§3470, 3472 (M. & V.); §§2773, 2775 (T. & S.).

Cases cited and approved: Bruce *v.* Baxter, 7 Lea, 477; Ramsay *v.* Temple, 3 Lea, 253.

8. BANKS AND BANKING. *Duties and responsibilities of bank directors.*

Bank directors are held to the exercise of only ordinary care and diligence in the discharge of their duties. They are not required to give their whole time and attention to the performance of these duties, but only so much as, under the special circumstances of each particular case, may be demanded for the reasonable protection of the interests committed to their care. They are not insurers of the fidelity or capacity of the cashier or other agents to whom the business and assets of the bank may be intrusted, but are required to exercise due care in their selection and proper supervision over their action. (*Post, pp. 652–654.*)

9. SAME. *Same. Responsible for cashier's acts, when.*

It is gross negligence in bank directors to commit the entire business of the bank to the cashier, without supervision or control on their part, although he may be an entirely competent man; and they are respon-

sible, in such case, for all losses resulting to the corporation from the negligent or criminal acts of the cashier, provided such losses could have been prevented by the exercise of proper diligence on their part. (*Post, pp. 653, 654.*)

10. SAME. *Same. Burden of proof.*

In suit against bank directors to charge them with losses which it is averred the corporation sustained in consequence of their negligence, the burden is upon the complainant to prove not only the losses sustained, but that they resulted from the directors' negligence. "One who seeks to recover for negligence must allege and prove it." (*Post, p. 654.*)

11. SAME. *Same. Measure of cashier's duty.*

A bank cashier is required to exercise reasonable skill, care, and diligence in the discharge of his duties. He does not guarantee the solvency of customers. He is not responsible for mere mistake of judgment. Neither he nor the bank directors, however negligent they may have been in their control and supervision of the affairs of the bank, are responsible for losses that resulted notwithstanding the exercise of due skill and diligence on the part of the cashier, and would have resulted notwithstanding proper supervision and control of the corporate affairs by the directors. (*Post, p. 643.*)

Case cited: 48 N. Y., 305.

12. SAME. *Same. Negligence without damage.*

Bank directors, though negligent, incur no liability, if no loss resulted to the corporation from their negligence. (*Post, pp. 644–648.*)

13. SAME. *Same. · For usury.*

Bank directors, though negligent in their supervision and control of the corporate affairs, are not responsible for the failure to collect a well-secured debt for the reason that usury was included therein. (*Post, p. 648.*)

14. SAME. *Same. For overdrafts.*

Bank directors, though negligent in their supervision and control of the corporate affairs, are not responsible for overchecks permitted by the cashier to a reasonable extent in favor of responsible customers. "It is not negligence *per se*, in the absence of a by-law or order of a superior officer, for a cashier to pay the overcheck of a responsible customer." (*Post, p. 655.*)

15. SAME. *Same. Same.*

Bank directors are not responsible in any case for overchecks permitted to customers by the cashier without their authority or knowledge.

*Question reserved:* Is it negligence in a cashier to pay overchecks to a reasonable amount of regular customers, who had but little property, but who had credit and were accustomed to pay their debts?

16. SAME. *Same. Same. Notice.*

The fact that such overchecks appeared upon the bank books does not affect the directors with notice thereof, in a suit between the directors and the bank. (*Post, p. 659.*)

Cases cited and approved: 87 Ky., 323; 36 Fed. Rep., 617; 25 Ch. Div., 725; 110 U. S., 8.

Cited and distinguished: Lane *v.* Bank, 9 Heis., 437.

17. SAME. *Same. Same. By cashier in his own favor.*

A resolution by a board of bank directors intrusting the lending of money and discounting of paper to the discretion of the cashier does not authorize him to lend to himself. (*Post, p. 646.*)

---

FROM LINCOLN.

---

Appeal from Chancery Court of Lincoln County. GEORGE E. SEAY, Ch., sitting by interchange.

LAMB & TILLMAN and COOPER & FRIERSON for Wallace.

CARMACK & WOODARD, J. H. HOLMAN & CARTER, and A. S. MARKS for Respondents.

LURTON, J. This is a bill by a share-holder and creditor of the Lincoln Savings Bank in be-

half of himself and all other share-holders and creditors against such directors of the bank as held office at different times between the organization of the bank, in 1870, and its suspension in 1886. The other defendants are the corporation itself, under its corporate name, and the trustee of the corporation under a general assignment for benefit of creditors made in August, 1886. The bill charges that the defendant directors, by their inattention, negligence, and mismanagement, have been guilty of a breach of trust, whereby the bank has been reduced to insolvency, its capital wasted, and the shares rendered worthless.

There was a decree in favor of complainant for the use of the corporation against several of the defendants, holding them liable for certain losses sustained through improvident discount, overchecked accounts, and neglect to bring suits upon matured paper. The decree has been appealed from by complainant and defendants. Such a bill cannot be maintained by complainant for his peculiar and personal benefit. The wrongs complained of do not especially affect his stock or his demands as a creditor. The negligence of the defendants was in the discharge of duties to the corporation as such; and the corporation, for such negligence, has a right of action. Primarily, therefore, such suit should be brought by the corporation in its corporate name; and only under peculiar circumstances will a creditor or stockholder be permitted by Courts of Equity

to bring the suit which the corporation has failed
to bring. But where the corporation is disabled
from suing—as, where the managing agents of the
corporation, its officers and directors, are themselves
to be the defendants, or where the corporation
wrongfully and willfully refuses to sue—then, in
either case, a Court of Equity will entertain a
suit by a share-holder, substituting him to the
collective or corporate right of action. In either
case it is most obvious that the recovery must be
for the benefit of the corporation, all its creditors
and share-holders, innocent and guilty, sharing pro-
portionately in the benefits of the decree. The
learned Chancellor was correct in holding that
the decree obtained by complainant inured to the
benefit of the corporation, and that complainant
was not entitled to any preference or priority over
other creditors or stockholders. The assignment
of errors on this point by complainant is therefore
overruled.

The defendants were not in office at the time
this suit was begun. The corporation was not
therefore disabled from suing by being in the
hands and under the control of the parties to be
sued. It must therefore appear, before complain-
ant will be suffered to carry on such a suit, that
the corporation, or those authorized to represent
it, have been requested to sue, and that they have
_wrongfully_ refused to bring the suit.

It by no means follows that the mere refusal of
the corporation to bring a suit will authorize any

stockholder dissatisfied with such decision to him-
self conduct the suit.  A very wide discretion is
necessarily reposed in the directors of a corpora-
tion.  It is not the duty of the managers of such
associations to bring suit upon every supposed
wrong or injury to the corporation.  If it were
so strangers could never know when a settlement,
compromise, or adjustment was a finality if the
matter was subject to be overhauled at the suit of
any discontented share-holder.  So a suit might
appear so desperate, or be so expensive, or, for
good reasons, impolitic, that directors might, in
the exercise of a sound discretion, deem it unwise
to engage in litigation.  In such case, if the re-
fusal be in good faith, the Courts will rarely suf-
fer a share-holder to overturn such decision by
entertaining his suit for the same cause of action.
To authorize his suit, the refusal of the corpora-
tion to sue must appear to have been wrongful.
Morawetz on Private Corporations, Sec. 244.

The bill alleges and the proof shows that the
president of the defendant corporation was duly re-
quested to bring an action in the corporate name
against the former directors for the cause of ac-
tion stated in this bill.  This he declined because
he did not deem the facts submitted to him justi-
fied such suit.  This demand was not laid before
the directors then in office, and they have never
been requested to sue; nor have they declined to
sue.  The directors, not the president, represent
the corporation.  The failure to show that a ma-

jority of the board had wrongfully refused to bring such suit, would be fatal to complainant's right to sue but for certain facts now to be stated.

In August, 1886, this bank was hopelessly insolvent, and, in that situation, a general assignment of all its assets was made to the defendant, Hancock, as trustee, for the benefit of all creditors, any surplus to be paid over to the corporation. Hancock accepted the trust and qualified as trustee. Subsequently he was requested to bring this suit and declined, deeming himself unauthorized. This right of action passed as an asset to the trustee. *Hume* v. *Bank*, 9 Lea, 744.

After the assignment he represented the corporation as well as its creditors, and was alone authorized to have sued upon a corporate right of action. This point has been repeatedly settled by other Courts. *Williams* v. *Hilliard*, 38 N. J., 376; *Ackerman* v. *Halsey*, 37 N. J., 273; *Jones et al.* v. *Johnson et al.*, 86 Ky., 530; *Savings Bank, etc.*, v. *Caperton*, 87 Ky., 306; *Brinckerhoff* v. *Bostwick*, 88 N. Y., 52.

In the case last cited the suit was against the directors and officers of an insolvent national bank in the hands of a receiver appointed under the provisions of the national banking law. The receiver had refused to sue. The Court held that the right of action was in him, and his refusal authorized a share-holder to present a bill in behalf of himself and all other share-holders, the

receiver and the corporation being made defendants. The decision was not based upon any of the peculiar provision of the Act of Congress concerning effect of appointment of a receiver, or liability of officers and directors of national banks, but was squarely planted upon the general principles governing Courts of Equity in such cases. We do not think that the trustee of an insolvent corporation would have so wide a discretion as to suing as exists in the directors of a solvent and going corporation. In the case of the refusal of the managers of a corporation, an appeal would lie to the general meeting of share-holders; and if in such refusal they did not represent the will of a majority, it could be then made to appear, and a board elected who could reverse their action. From the refusal of the trustee there was no appeal save to a Court of Equity. The case presented on the face of the bill was not frivolous, but was so grave in character and important in amount as to have made it the duty of the trustee to have submitted the charges to the decision of a Court.

This bank was organized in 1870 under a private charter granted by this State in 1869. The capital stock was one hundred thousand dollars, all of which was ultimately paid in. Some of the defendants were elected directors in 1870, and by annual re-election continued in office until 1885 or 1886. Others served for very short terms, while still others held office for from one to ten years.

They are not charged with any sort of fraudu-

lent collusion.  Indeed, no intimation is found in
pleadings or proof that any one of them profited
directly or indirectly by any of the alleged acts of
mismanagement or . negligence.  All of them were
stockholders, largely interested in the success of
the association, . and all suffered equally with com-
plainant by its disastrous failure.

The liability of defendants to the corporation is
predicated alone upon the proposition that certain
losses sustained by the bank during its fifteen
years of business activity were the direct conse-
quence of the negligence of defendants while
directors.  The principal fact constituting this
alleged negligence is a charge that the board of
directors abdicated their trust by failure to super-
vise the management, and turned over the entire
control of the business of the bank to the un-
limited discretion and unaided judgment of the
cashier; that, as a consequence, the bank had sus-
tained great losses through a series of unwise, in-
defensible transactions, engaged in by the cashier
without the aid, advice, and supervision of those
charged by their selection with the duty of exer-
cising an intelligent judgment in the control of
that officer.  The allegation necessarily is that these
transactions, so disastrous in their consequences,
would have been avoided, and these losses escaped,
but for the negligence and inattention of defendants in
office at the dates of the several transactions.  The
losses alleged to be a consequence of this breach
of duty may be conveniently classified as follows:

*First.*—That there is an unexplained deficit of about $40,000, the proof of which consists in the fact that the liabilities of the corporation, including its capital stock of $100,000, exceeds in amount the nominal value of all assets, good and bad, by the sum stated. This difference between liabilities and nominal assets is charged to be a deficit for which defendants must account. The books of the bank are no part of the record. No balance-sheets are exhibited, and no expert testifies as to the state of the bank as shown by its books. There are many ways in which this deficit of nominal assets may be accounted for. Debts deemed worthless ought to be charged off to profit and loss; in which case they would no longer appear as an asset. This, indeed, appears to have been done to the extent of perhaps $20,000. But a more certain solution of this matter is found in the fact that 126 per cent. has been paid out in dividends upon paid-up stock. A profit justifying such dividends was made to appear by carrying as solvent large amounts of paper held by the bank which subsequently turned out to be wholly or partially worthless. So real estate taken for debt continued to figure as an asset of the value of its cost to the bank, whereas large losses were subsequently sustained when sales were made.

Again, in the statements to the directors, made by the cashier, of the business of the bank no overdrafts are shown. His habit was to deduct overchecks from aggregate amount due depositors.

This was delusive, for large losses ultimately resulted from these very overdrafts. Thus it is a case where capital has been paid out in dividends, and the assets reduced below liabilities. Complainant does not seek a recovery of this deficit or for dividends improperly paid. It is obvious that he could not, directly or indirectly, be allowed to again recover money already once paid him in the shape of dividends. *Turquand* v. *Marshall*, L. R. Ch. Appeal Cases, Vol. IV., p. 582.

In that case Lord Haverly said of a suit against directors by share-holders, in part originating in improper payment of dividends, "that this was a very singular claim, as, in fact, it was asking the directors to pay over again to the share-holders what they had already received as dividends."

The Chancellor was clearly right in refusing to hold defendants to an account as to this so-called deficit. The second assignment of error by complainant is therefore overruled.

*Second.*—The bill charges that within a few years after organization over $50,000 of the capital appeared to have been invested in real estate; that ultimately losses approximating $20,000 were sustained by reason of this diversion of assets. The facts do not sustain this charge. The bank did, at one time, own real estate costing nominally $50,000; but this was the result of foreclosure of mortgages and execution sales. The panic of 1873 and the hard times ensuing, together with local crop failures, operated to ruin large numbers of the bank's

41—5 P

debtors.  In some cases mortgages were taken, and in others suits were brought.  It was deemed safe to bid the bank's debts upon lands sold under execution and at foreclosure sales.  For years following real estate steadily declined, and was almost unsalable.  The bank held, hoping to save itself.  Ultimately the losses complained of were realized.  There is nothing in the evidence tending to show any thing more than bad judgment in the management of debts, good when made, but imperiled by subsequent events.  Indeed, the proof hardly makes out a case of error in judgment; for the probability seems to be that, in bidding the debts upon the lands and holding for a better market, the bank's officers did what the most prudent and sagacious would have done at the time and under same circumstances.

Complainants, however, insist that all the loans represented by this real estate were made by the cashier, and without the approval or knowledge of the directors or any committee, and that all the subsequent steps resulting in its acquisition were taken by the cashier, possibly with knowledge and approval of the president of the corporation, but without the knowledge or consent of the board of directors.  This is perhaps true, for it is shown that the first board of directors by resolution gave the cashier exclusive charge of the loans and collections of the bank, and that down to perhaps as late as 1880 this responsibility was reposed exclusively in that officer, the directors during all

that time rarely meeting and having little, if any, knowledge of the business of the bank beyond what appeared in the annual statements made by the cashier to the directors and stockholders. Ordinarily this would constitute such gross negligence as to make directors responsible both for the criminal defaults and negligent acts of the cashier. There are circumstances, however, to which it may hereafter be necessary to refer, which much mitigate this apparent abdication of duty. Ignoring these circumstances, and treating this as responsible negligence, complainant can only fix liability upon defendants by first convicting the cashier of negligence in regard to these transactions.

A cashier is bound to exercise reasonable skill, care, and diligence in the discharge of his duties. If he fails in such skill, or omits such care, and the bank suffers damage as a consequence, he is liable. If intrusted with the duty of making loans, he is not responsible as a guarantor of the solvency of his transactions, or responsible for an error of judgment where he has exercised reasonable skill, diligence, and prudence. *Bank of Albany* v. *Ten Eyck*, 48 N. Y., 305.

Complainant has not shown that there was any want of care or prudence in making these loans, or in the subsequent steps taken to secure or collect them. If the cashier is not chargeable with any want of care or skill about these matters, then it follows that defendants are not liable, for they, at most, can only be liable for losses resulting

from his negligence in these matters. There was no negligence in the selection of the gentleman then filling the office of cashier. He bore a very high reputation as a business man of integrity and intelligence, and was better acquainted with the credit of the customers of the bank than any man in the county. We therefore concur with the Chancellor in ruling that no liability attaches to any of defendants by reason of losses ultimately resulting from shrinkage in values which human foresight could not guard against.

*Third.*—The next loss with which it is sought to charge the directors is one of $20,000, said to have resulted from loans made to the cashier, Hampton, and to the firm of Carloss & Hampton, of which he was a partner. Hampton began borrowing as early as 1873, either for himself or his firm. His notes were, from time to time, renewed and other sums borrowed until the indebtedness of the two men reached the enormous sum of $50,000 in 1879. During this year the directors, for the first time, discovered these transactions. Hampton was himself a large share-holder, having in his own name something over $10,000 in stock. Under the charter the bank was given a lien upon the shares of a borrowing stockholder for the security of his loans. It appears that the president of the corporation had authorized Hampton to borrow to the extent of his stock, it being then at a premium. With this exception none of the directors were aware of the fact that their cashier

was borrowing from the bank; and all, including the president, were greatly surprised when, in 1879, the extent of his indebtedness was discovered. Hampton was regarded as a man of fine estate and rare financial capacity, and the bulk of the stock was taken by subscribers upon the understanding that he was to be made the cashier, and, as such, to have the management and control of the bank. After his election the first official act of the directory was, by resolution, to give him exclusive control of the discounts of the bank. No by-laws were adopted at any time by the share-holders, and none by the directors for their own government. None of the directors, originally or subsequently elected, had had any experience whatever in the banking business. Confidence in Hampton's integrity and financial ability seems to have underlaid the action of share-holders and directors alike. A portion of the directors were country gentlemen, living remote from the location of the bank. Others were lawyers and merchants of Fayetteville, but all fully occupied with their personal affairs. The president of the bank, up to his death in 1885, was the late Col. D. W. Holman, a lawyer of large practice, which very fully engaged his time and energy. He was allowed a small salary, and seems to have been much about the bank, much consulted by the cashier, and to have given the business of the bank a general supervision. Having died before the institution of this suit, we have not had the

benefit of his evidence; but, from all that is shown, he only consented to the borrowing by Hampton of a sum equal to his stock, and was wholly ignorant of the subsequent large loans. Up to the discovery of these loans to Hampton and his partner, the directors had had few meetings, and knew little of the business of the bank. Its management was intrusted to the judgment and discretion of the cashier, with such general supervision as the president was able to give. The resolution intrusting the lending of money and discounting of paper to the discretion of the cashier did not authorize him to lend to himself. He could not represent himself and the bank at the same time, and his conduct in this matter is not to be defended, and was a clear breach of duty upon his part. So soon as these loans were discovered the directors resumed the general control and management of the bank. Hampton was in a short time superseded by a new cashier of high character and experience. Such steps were taken as resulted in obtaining security by way of collaterals or mortgages, amply protecting the bank against loss on these loans. By sale of collaterals, and payments by the debtors, these debts were finally reduced to about $28,000. After several extensions suit at law was brought upon the unpaid balance. This suit was enjoined by the debtors by bill in chancery, seeking an account of usury, and claiming that the entire sum remaining due consisted of usury, which had from time to time been com-

pounded. This suit was pending when complainants' bill was filed; but before the hearing the trustee, Hancock, compromised the matter by accepting $8,000 in full of the notes for $28,000 remaining unpaid. For the loss thus sustained complainants seek a decree against the defendants in office when these loans were made.

In the view we take of this matter it is unnecessary for us to consider whether the ignorance of the defendant directors of the fact of these loans is, under the peculiar circumstances of this case, such negligence as to make them chargeable with the consequences to the corporation. Assuming their responsibility if loss occurred, did the bank sustain any loss as the direct consequence of the negligence of the defendants in not preventing such use of the bank's funds by its own cashier? We think no such loss is shown. The balance due on the notes of Hampton & Carloss was amply secure at the time the trustee compromised their liability. This compromise was not made by reason of any insolvency of the debtors or any infirmity in the securities held by the bank. The only defense was usury. The trustee regarded the whole debt as in peril by reason of this defense. The debtors claimed that the entire balance of $27,000 or $28,000 was for usury. If this was true it was a complete answer to the demands of the bank. The compromise was urged by a majority of the share-holders. The trustee submitted to the Chancery Court his power in the premises,

which being held ample, he, as for the best interest of creditors and all concerned, agreed to the proposed settlement. Defendants cannot be held liable because usury upon a well-secured debt has not been collected. The settlement is a bar to a suit against them by the corporation, and therefore a bar to complainant's bill so far as this item is concerned. But upon another and distinct ground complainant cannot recover, and that is the bar of the statute of limitations. None of these loans were made after 1879. The negligence of defendants, if any there was, occurred prior to January 1, 1880. This suit was begun in December, 1886, more than six years after the last act of negligence in this matter. The Chancellor seems to have entertained the opinion that because a stockholder can alone sue in equity upon such a cause of action, that therefore this was one of that class of purely equitable actions against which the statute does not operate. But, as we have before seen, this kind of suit is, at last, but the suit of the corporation for its benefit and upon its right of action. If for any reason the corporation is estopped from suing, or its action is barred, the suit by the stockholder or creditor is likewise affected. "A suit of this character," says Mr. Morawetz, "is brought to enforce the corporate or collective rights, and not the individual rights of the share-holders. It may therefore properly be regarded as a suit brought on behalf of the corporation, and the share-holder can enforce only

such claims as the corporation itself could enforce. Moreover, the essential character of a cause of action belonging to a corporation remains the same, whether the suit to enforce it be brought by the corporation or by a share-holder. Thus a *legal* right of action would not be treated as an equitable one, or become governed by the rules applicable to equitable causes of action, as to limitations, etc., because a share-holder has brought suit in equity to enforce it on behalf of the company." Sec. 271.

Directors are not express trustees. The language of Special Judge Ingersol in *Shea* v. *Mabry,* 1 Lea, 319, that "directors are trustees," etc., is rhetorically sound, but technically inexact. It is a statement often found in opinions, but is true only to a limited extent. They are mandatories; they are agents; they are trustees in the sense that every agent is a trustee for his principal, and bound to exercise diligence and good faith; they do not hold the legal title, and more often than otherwise are not the officer of the corporation having possession of the corporate property; they are equally interested with those they represent; they more nearly represent the managing partners in a business firm than a technical trustee. At most they are implied trustees in whose favor the statutes of limitations do run. *Hughes* v. *Brown,* 88 Tenn., 578; *Spering's Appeal,* 71 Penn. St., 11; Morawetz on Corporations, Sec. 516.

An action at law lies in favor of the corpo-

ration against directors for malfeasance, misfeasance, or negligence in office, whereby loss or damage has resulted; and the limitation applicable to the suit of the corporation at law is equally applicable to the suit of the stockholder upon the corporate right of action in equity. Morawetz on Corporations, Sec. 271; Cook on Corporation Law, Sec. 701; *Godbold* v. *Bank of Mobile,* 11 Ala., 191; *Williams* v. *Hilliard,* 38 N. J. Eq., 383; Spering's Appeal, 71 Penn. St., 11; *Brinckerhoff* v. *Bostwick,* 99 N. Y., 193.

Our statutes of limitation operate upon all causes of action save suits between *cestui que trust* and express trustee under pure technical trusts cognizable only in Courts of Equity. *Hughes* v. *Brown,* 88 Tenn., 578.

The statutes of six and three years were relied upon by defendants, both by demurrer and plea, as applicable to complainants' entire cause of action. By § 2773 it is provided that "actions for injuries to personal or real property, actions for the detention or conversion of personal property," shall be barred unless suit is brought within three years from the accruing of the cause of action. This is not a suit for either injury to or conversion of personal property, and this section is not applicable. The last clause of § 2775 provides a limitation of six years for all actions "on contracts not otherwise provided for." The case of *Bruce* v. *Baxter,* reported in 7 Lea at page 477, was a bill in chancery against an attorney

for neglect of duty in the collection of claims in his hands, whereby they were lost. The clause we have quoted from § 2775 was held applicable to the suit. The reasoning of Judge Freeman, who delivered the opinion of the Court, was that the relation of client and attorney implied a contract for the exercise of reasonable skill and diligence in doing what was undertaken, and that a failure to exercise such diligence was a breach of contract rendering the attorney liable for the loss resulting, but no more. A similar ruling was made in the earlier case of *Ramsay* v. *Temple*, 3 Lea, 253, it being a suit against an attorney for negligence in failing to sue out an execution. Those cases are controlling in this. The relation of a director to a corporation implies a contract that he will use ordinary diligence in the discharge of the duties he undertakes by accepting the office. For a breach of this duty an action lies, which is barred unless begun within six years from the time right of action accrued. There has been no fraudulent concealment of the cause of action by defendants, and the remedy of the corporation for any negligence in the matter of the loans to Hampton, or Hampton & Carloss, is barred.

Upon the pleadings and proof the Chancellor dismissed complainants' bill so far as it was sought to fix liability by reason of the matters heretofore considered. As to losses claimed to have resulted from overchecks, save certain items which he held unsupported by evidence sufficient to justify a

reference, and losses resulting from improvident
discounts, and claims lost by neglect to collect
before insolvency or barred by limitation, he
ordered a reference to the Master, laying down
very distinctly the grounds upon which the defend-
ants were to be charged. Upon this report and
exceptions thereto, decrees were finally pronounced
against defendants, aggregating about four thousand
dollars. Errors have been assigned by both parties
upon the decree of reference as well as upon the
final decree. The first error assigned by complain-
ant is that the Chancellor put upon complainant
the burden not only of showing losses sustained by
the corporation, but that such losses were attribu-
table to the negligence of defendants.

Directors, by assuming office, agree to give as
much of their time and attention to the duties
assumed as the proper care of the interests intrusted
to them may require. If they are inattentive to
these duties, if they neglect to attend meetings of
the board, if they turn over the management of
the business of the company to the exclusive con-
trol of other agents, thus abdicating their control,
then they are guilty of gross negligence with re-
spect to their ministerial duties; and if loss results
to the corporation by breaches of trust or acts of
negligence committed by those left in control,
which by due care and attention on their part
could have been avoided, they will be responsible
to the corporation. The diligence required from
them has been defined as that exercised by prudent

men about their own affairs, being that degree of diligence characterized as ordinary. If a less degree of diligence is exercised, the negligence is gross, and for losses consequent he is liable. "What constitutes a proper performance of the duties of a director," says Mr. Morawetz, "is a question of fact which must be determined in each case in view of all the circumstances; the character of the company, the condition of its business, the usual methods of managing such companies, and all other relevant facts must be taken into consideration." Morawetz on Corporations, Sec. 552.

Bank directors are not expected to give their whole time and attention to the business of the company. The customary method in regard to such associations is that the active management and responsible custody is left to the cashier and other agents selected by the directors for that purpose. These are paid salaries, demanding their skill and time should be given to the duties of immediate management. As a rule the custodian of the assets is the cashier. The duty of directors with respect to such is to supervise, direct, and control. These agents, though usually selected by the directors, are not the agents of the directors, but agents of the corporation. Mor. Corp., Sec. 552 *et seq.*

The neglect which would render them responsible for not exercising that control and direction properly must depend upon the circumstances of each particular case. They are not insurers of their

fidelity, and they are not liable for their acts on any principle of the law of agency.

"Directors," says Mr. Morawetz, "can be held responsible for a loss resulting from wrongful acts or omissions of other directors or agents only provided the loss was a consequence of their own neglect of duty, either in failing to supervise the company's business with attention, or in neglecting to use proper care in the appointment of such agents." Morawetz on Corporations, Sec. 562.

The collection of matured paper and the paying of checks primarily pertain to the duties of the agents of the corporation having the immediate management of its business. If defendants were liable in regard to such matters, it was for negligence in the selection or retention of such agents, or for neglect in the control and direction of these agents concerning their duties in such matters. It, therefore, devolved upon complainant to show that defendants had been neglectful in their duty in controlling or supervising these agents, and that this want of due care and attention had resulted in losses to the corporation. The ruling of the Chancellor that the burden was upon complainant not only to prove losses, but to show that such losses were the consequence of the negligence of the directors, was right. One who seeks to recover for negligence must allege and prove it. So he must show that the damage he seeks to recover was the consequence of this negligence. *Bruce* v. *Baxter*, 7 Lea, 477.

Complainant's first assignment of error must be overruled. The only remaining assignment of error by complainant is the third, which is that it was error in the Chancellor to refuse a reference as to certain losses resulting from overchecks by O. P. Bruce & Co., F. J. Gray & Co., and Caldwell & Kelso. As to the overchecks of Bruce & Co., and F. J. Gray & Co., it is enough to say that they were all made more than six years before this bill was filed, and any liability is barred. The only evidence cited to support the assignment as to the overchecks of Caldwell & Kelso is that of the trustee, Hancock. The witness does not show that this firm was irresponsible when their account was overdrawn. It is not negligence *per se*, in the absence of a by-law or order of a superior officer, for a cashier to pay the overcheck of a responsible customer. Such overchecking is not uncommon, and in practical banking is almost unavoidable. In effect the payment of an overcheck is a loan without security, upon the implied condition that the account shall be made the next day or upon notice. If not responsible negligence in the cashier to pay the overdrafts of responsible customers, it is clearly not a matter for which the directors can be made liable by mere proof that an account was overdrawn and a loss sustained. The assignment is overruled.

We come now to consider the errors assigned by defendants. The first is, that it was error to charge defendants with the notes of W. N. Moore

and W. T. Ross as discounts improvidently made. The Moore note was taken in 1882 by the president of the bank, in renewal of a balance due upon an old note. The original note, as shown by the fact that the new note was chiefly for past-due interest, was discounted more than six years before bill filed. The negligence, if any, was in discounting the original note, and any cause of action for that matter was barred. The W. T. Ross note was only for twenty-one dollars, and the cashier, Thomas, proves that a claim on Boyer & Blake, who were then regarded as responsible, was taken as collateral security. There was no negligence in this, and the first assignment is sustained.

The sixth assignment is, that it was error to charge defendants with certain small notes barred by limitations. The Master had reported that there was no proof to show any losses sustained by neglect to sue. Upon exception by complainant, the defendants were charged with these notes. The only evidence cited by complainant to support this charge is that of Mr. Hancock, who, in answer to the question as to what assets turned over to him were barred, answered and set out these notes. It is not shown that they were solvent when discounted, or at any other time. It does not follow that they were lost to the bank because barred when they came to the hands of the trustee. Complainant should have gone further and shown that they were solvent assets. The assignment is sustained.

The fourth assignment complains that it was error to charge defendants with the overchecked accounts of McCown Bros., and J. E. Caldwell & Co. The Master had reported in favor of defendants upon these items, but upon complainant's exception they were charged to defendants. The evidence does not show that these firms were irresponsible when their accounts were overdrawn.

The ruling made on complainant's third assignment with reference to the overchecked account of Caldwell & Kelso applies to this, and the fourth assignment of error by defendants is sustained. The remaining assignments relate to the overchecked accounts of the following firms and individuals, all of which were charged to the defendants: W. T. Ross and W. T. Ross & Co., $1,359.86; R. P. Hairstone, $328.59; Ship-Miles, $72.69.

The decided weight of proof with reference to the last two accounts is that while the drawees had little property, yet they were in business and had credit, and were accustomed to pay their debts. As to W. T. Ross, he was not indebted, was a man of character, was a profitable customer to the bank, and had a very large insurance business. The cashier was in the habit of indulging these parties by permitting them to overdraw, they paying interest. While it is probably true that none of these parties had property subject to execution, yet they were people of character and of business integrity demanding and receiving credit. They had often overdrawn and made their accounts

42—5 P

good.   If it were shown that these overchecks were with the consent of defendants, it would not necessarily follow that they were liable upon mere proof that the drawees could not be coerced into payment.   We are not to try the responsibility of bank officers or bank directors by the vigorous principles regarding loans by technical trustees or guardians or executors.   To lend at all is a breach of trust by some trustees who have no authority to lend.   But in this case we are dealing with an institution whose business it is to lend.   The law has never undertaken to rigidly define the conditions upon which banks may lend.   Among business men there is found a degree of trust and reliance upon moral character, business integrity, and thrift, justifying to a business man the soundness and prudence of a transaction which to judges and lawyers engaged in applying the hard and fast rules of law would seem indefensible and reckless. The standard of diligence and prudence by which bank officers and bank directors should be tried, is that which business men have erected for themselves.   Reasonable conformity to the customs and methods in vogue among prudent bankers is the degree of diligence required of such officers.   Several of the overchecked accounts heretofore disposed of upon other grounds were the accounts of men engaged in buying and shipping produce.   One of those now under consideration was that of a man engaged in buying and shipping stock.   These accounts were overdrawn upon an agreement that

drafts drawn against the shipment with bill of lading attached should be turned over to the bank and the account thus made good. Advances were made in this way, and the men thus enabled to carry on their business. In some instances losses finally resulted because of losses sustained by decline of values. In others the fund was misapplied. Without, however, determining the liability of defendants if it had been shown that these accounts were overchecked by permission of defendants, we decide only the case presented. The defendants did not authorize these overdrafts; nor did they have actual knowledge that the accounts were being overdrawn; nor is there any presumption of knowledge from the mere fact that entries upon the books of the bank would have shown that the cashier was permitting overdrafts.

A director in a suit between himself and the corporation, or those suing upon the corporate right of action, is not presumed to have knowledge of all that is shown by the books of the company. The presumption of knowledge attaching to a director which is referred to in the case of *Lane* v. *Bank*, 9 Heis., 437, applies only in suits between the bank and a stranger. The doctrine has never been extended to suits between the bank and its directors. *Savings Bank of Louisville* v. *Caperton*, 87 Ky., 323; *Clews* v. *Borden*, 36 Fed. Rep., 617; *In re Dunham*, 25 Ch. Div., 725.

The doctrine of the Lane case is carefully limited in *Martin* v. *Webb*, 110 U. S., 8.

Whatever may be said as to the negligence of the directors in office prior to 1880, it is overwhelmingly shown that after that time, and through the entire period covered by the overchecking now under consideration, that there was no inattention to the duties of their office. Meetings were regularly and frequently held, the assets in shape of discounted paper were carefully examined, and directions given as to collections. The cashier was forbidden to allow any overchecking, and he was required to have the approval of at least one director to the discounting of any paper. Vigilant efforts were made to save the bank by closely looking after its assets. It is true that the money in the hands of the cashier was never counted, but as no defalcation or larceny was ever committed, the fact becomes immaterial. After this renewed vigilance and attention there was no such habit or custom of permitting doubtful overchecks as to operate as notice; and under all the circumstances, we do not think defendants chargeable with the items embraced in the assignment of error now being considered.

Reverse the decree of the Chancellor, and dismiss the bill at cost of complainant.