GREEN *v.* ASHE.

(*Knoxville.* September Term, 1914.)

1. **CORPORATIONS.** Use of funds for purchase of stock. Liability.

Where the president of a corporation purchased stock from a stockholder and resold it the next day at the same figure, the fact that he used the funds of the corporation in paying the stockholder did not create a liability against the stockholder in favor of creditors of the corporation, on it becoming insolvent. (*Post, pp.* 618, 619.)

Cases cited and approved: Clark v. Clark Machinery Co., 151 Mich., 416.

2. **BANKS AND BANKING.** Purchase of corporate stock. Statutory provisions.

Under Shannon's Code, sec. 3232, providing that no part of the capital stock of any bank shall be withdrawn until its liabilities are satisfied, and section 3235, prohibiting any bank buying in its own capital stock, a sale by a stockholder in a bank of his stock to the bank is invalid, and the receiver of the bank, on its becoming insolvent, may recover of the stockholder the amount paid by the bank. (*Post, pp.* 619, 620.)

Code cited and construed: Sec. 3235 (S.).

Acts cited and construed: Acts 1859-60, ch. 27, sec. 17.

Cases cited and approved: Burrows v. Niblack, 84 Fed., 111; Tait v. Pigott, 32 Wash., 344; Union Trust & Savings Bank v. Amery, 72 Wash., 648; Fitzpatrick v. McGregor, 133 Ga., 332; Hall v. Henderson, 126 Ala., 449.

3. **BANKS AND BANKING.** Purchase of corporate stock. Statutory provisions.

A stockholder of a bank, who had resigned as director, sold his stock to the president, who stated that he would sell the same

to a person named. The president used the funds of the bank to purchase the stock, and the bank gave to the stockholder credit for the proceeds, and issued to him a duplicate deposit slip. The certificate of stock was carried in a drawer of the bank as a cash item. The stockholder understood that he dealt with the president as an individual, and that the consideration came from him through the bank, and knew nothing of the bank acquiring the stock. *Held*, that the stockholder, on the bank becoming insolvent, was not liable to the bank for the proceeds of the sale. (*Post, pp.* 620-625.)

Cases cited and distinguished: Crandall v. Lincoln, 52 Conn., 73; Johnson v. Laflin, 5 Dill., 65.

Cases cited and approved: German Savings Bank v. Wulfekuhler, 19 Kan., 60; Grady's Case, 1 De G. J. & S., 448; Nicol's Case, 3 De G. & J., 387; Columbian Bank's Estate, 147 Pa. St., 422; Corn v. Skillern, 75 Ark., 148; Bargate v. Shortbridge, 5 H. L. Cas., 297; Taylor v. Hughes, 2 Jones & L., 24; Ex Parte Bagge, 13 Beav., 162; Wallace v. Bank, 89 Tenn., 630.

---

FROM KNOX.

---

Appeal from the Chancery Court of Knox County.— W. D. WRIGHT, Judge.

SHIELDS & CATES, for appellant.

WRIGHT & JONES and GREEN, WEBB & TATE, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This is a suit by Green, as receiver of the insolvent Knoxville Banking & Trust Company, to recover of de-

fendant Ashe the sum of about $12,000, alleged to be due as the purchase price of 100 shares of the capital stock of the insolvent banking institution sold by Ashe through Gass, its president, to the bank itself, at a time when it was insolvent and so known to be by the seller, Ashe.

Ashe had purchased these 100 shares in April, 1908, from Gass, who was, at the time, the president of the bank, and held them until 1912, and served, for the major portion of the time at least, as a director of the bank. It appears that Ashe was also a director in another and rival bank in the city of Knoxville, the Third National Bank, in the affairs of which he was more active. In July, 1911, Gass complained to Ashe that he was bringing no business to the Knoxville Banking & Trust Company, in response to which Ashe urged his other banking connection, which seems not to have satisfied Gass. Thereupon Ashe verbally tendered his resignation as a director in the Knoxville Banking & Trust Company, and Gass, its president, replied, "All right." Thereafter Ashe did not attend any meetings of that bank's board of directors.

Prior to January 8, 1912, defendant Ashe, needing cash to meet obligations incurred in the purchase of lands in the state of Texas, informed Gass that it would be necessary to sell his stock in the bank, and Gass was asked to sell the stock for him. On January 8th he sold one-half of the stock, fifty shares, to Gass at $120 per share of $100 par value, Gass informing Ashe at the time that he purposed to sell the stock to

one Hutchinson. Gass was at the time generally rated as being worth about $75,000, and fully able to acquire the stock. In payment for the stock, Gass caused to be paid a note of $5,000 of Ashe in the bank, and for the balance Ashe was given credit as a depositor for $1,000, plus $11.67, refunded as unearned premium on the $5,000 note.

The next day, January 9th, the same fifty shares were sold at $120 per share to Hutchinson, evidently in order that he might be qualified to be elected director that day, on which was held the regular annual meeting of the bank's stockholders. At that meeting Hutchinson was elected a director in place of Ashe.

It developed later that, instead of taking over the shares of stock himself, Gass caused the same to be carried by way of a cash item in the bank from January 8th to 9th, as a bank asset, and payment for the shares was to be made by the bank. This, however, without the knowledge or participation of Ashe, who thought that he was dealing with Gass throughout. On these facts it is the claim of the receiver that Ashe is liable. The chancellor so decreed.

It is clear that in holding Ashe liable on account of this transaction of sale and purchase the chancellor was in error. We think it apparent that Gass merely used the bank and its funds as a medium for the carriage of the stock temporarily and until it was placed with Hutchinson, without purpose on his part to invest the bank's funds in its own shares. Certainly when by Gass' efforts the same shares were resold to Hutchin-

son the next day at the same figure, any possible wrong done to the bank and its creditors was repaired, and its receiver cannot complain. *Clark* v. *Clark Machinery Co.*, 151 Mich., 416, 115 N. W., 416.

This brings us to a consideration of what is denominated the second transaction. When in January the first sale was made, defendant Ashe informed Gass that he would have to sell his remaining fifty shares to meet another land note that would fall due in April. Gass offered him $120 for the same at that time, but Ashe refused the offer, asking $125. On March 29th, needing money for the purpose indicated, Ashe decided to and did sell these shares at about $120 per share, as he understood, to Gass, who stated that he was going to sell to another person named by him. On Ashe's request he was given credit on the books of the bank for the purchase price. The certificate for the fifty shares was carried in a drawer of the bank as a cash item in an envelope marked "Ashe stock." It developed that Gass had not purchased for himself, but had used the assets of the bank as he had done in the first transaction. Ashe, however, understood that he was dealing with Gass, as an individual, and that the consideration sum came from Gass through the bank. He knew nothing of the bank's acquiring the stock. Later the bank sold five of these shares at the advanced price of $125 per share. The chancellor decreed liability against defendant Ashe without allowance for the proceeds of the five shares so sold.

In December, 1912, the bank was hopelessly insolvent, and its assets were placed in the hands of complainant as receiver. Ashe has appealed, and here contends that he is not liable to respond in any amount.

In this State by statute (Acts 1859-60, ch. 27, sec. 17, Shannon's Code, sec. 3235) it is provided:

"No bank shall buy in, hold, or cancel its own stock; but may receive it in payment of bad and doubtful debts, or for the purchase of real estate, and in such case the stock shall be conveyed to a third party, in trust, to be sold by him for the benefit of such bank."

Another provision of said act is that "no part of the capital stock of any bank shall be withdrawn until its whole liabilities are satisfied," etc.

It is clear that under such prohibitory statute a transaction of sale by a stockholder of his shares to such a banking corporation is invalid, and the receiver of the bank may recover of the seller the amount which the bank paid for the stock. *Burrows* v. *Niblack,* 84 Fed., 111, 28 C. C. A., 128; *Tait* v. *Pigott,* 32 Wash., 344, 73 Pac., 364; *Union Trust & Savings Bank* v. *Amery,* 72 Wash., 648, 131 Pac., 199; *Fitzpatrick* v. *McGregor,* 133 Ga., 332, 65 S. E., 859, 25 L. R. A. (N. S.), 50; *Hall* v. *Henderson,* 126 Ala., 449, 28 South., 531, 61 L. R. A., 621, 85 Am. St. Rep., 53, and cases in note thereto.

For the receiver it is insisted that when it is shown by the proof that in point of fact the bank acquired and paid for the shares of one of its stockholders in the bank, the seller must respond; that the fact that

the stockholder in selling did not know or understand that the corporation was the purchaser does not avail to render the transaction valid. This insistence is supported, and we believe supported only, by *Crandall* v. *Lincoln*, 52 Conn., 73, 52 Am. Rep., 560, where it is said:

"The illegality of the transaction does not at all depend upon the actual knowledge or *mala fides* of the seller; if he in fact sells to the company and received in turn a part of the capital, the policy of the law requires him to know it, and conclusively charges him with knowledge."

It is urged that *German Savings Bank* v. *Wulfekuhler*, 19 Kan., 60, so holds, but it appears in that case that the selling stockholder was vice president and a director of the purchasing bank, and the court held that he would be presumed from that official relation to have knowledge of the nature of the acquisition by the bank.

For defendant Ashe it is contended that it suffices, in order to nonliability of a selling stockholder to the bank or its receiver, to show that when he sold he was ignorant of the fact that the bank was the purchaser; citing *Grady's Case*, 1 De G. J. & S. 448; *Nicol's Case*, 3 De G. & J., 387; *Johnson* v. *Laflin*, 5 Dill., 65, 13 Fed. Cas., No. 7393.

In our opinion neither contention is sound. The true rule is that the selling stockholder is in such case liable if he knew, or was by reason of the circumstances

*chargeable with knowledge,* that the bank was the real purchaser.

The case of *Johnson* v. *Laflin,* supra, was carried to the supreme court of the United States, and there reviewed and affirmed in an opinion delivered by Mr. Justice Field, 103 U. S., 800, 26 L. Ed., 532. In that case it appeared that Laflin, the stockholder, sold his shares through a broker to Britton, the president of the bank, but that Britton in fact used the funds of the bank to pay for same. The official stock register carried the stock in the name of Britton, as trustee, without stating for whom he was trustee, though the transaction was entered on the bank's stock ledger in an account with Britton as "trustee for the bank." The court, holding that the seller was not liable for repayment to Johnson, as receiver of the bank for its creditors, stated, in line with what we have just indicated:

"The whole transaction, on the part of Laflin, was free from any imputation of fraud. He sold his shares to a person competent to purchase and hold them, and received the stipulated price. It would be a perversion of justice and of the ordinary rules governing men in commercial transactions to hold the sale, under such circumstances, vitiated by the relations of the purchaser to others, of which the seller had no knowledge, *or any grounds to entertain a suspicion.*"

In *Columbian Bank's Estate,* 147 Pa. St., 422, 23 Atl., 625, 626, 628, the selling stockholder was held liable because "the circumstances connected with this sale of his stock were sufficient to put him on inquiry as

to the purchaser, and it is reasonable that he should be held to have the knowledge to which such inquiry would have led him;'' that is, that the bank and not the ostensible purchaser, an official of the bank, was being dealt with.

In *Corn* v. *Skillern*, 75 Ark., 148, 87 S. W., 142, it was held that a stockholder in a bank who sold his stock to the cashier in the usual course of trade, and had no reason to suppose that the cashier used the bank's funds to pay for the stock, is not liable to the bank, even though it afterwards became insolvent. See, also, *Hall* v. *Henderson,* supra, wherein this feature is commented on by the court.

In our opinion, it would be going too far to hold with the Connecticut court that the defendant would be liable to the complainant receiver as upon knowledge conclusively presumed from the facts that the purchase money was caused to be furnished by the bank, and that the shares were covered into its treasury. If the fraud here was only that of Gass, whom the bank had placed in a position of trust that enabled him to consummate the transfer in manner it appears to have been accomplished, and if it was not done with the knowledge or connivance of Ashe, a fact to be ascertained by the test above indicated to be the true one, the receiver for the creditors of the bank should be remitted for remedy to a pursuit of its delinquent president.

When we come to apply this rule to the facts disclosed in the record of the pending case, we are unable to see

any ground for holding defendant Ashe chargeable
with knowledge, or that he was put on inquiry that
would have led to knowledge that the bank's funds paid
for his fifty shares now being dealt with, or that the
shares passed to the bank as part of its assets. The
main point relied upon by the receiver to establish the
contrary is the fact that the bank gave defendant credit
for the proceeds of sale and issued to him a dupli-
cate deposit slip; but Gass, whom he had in mind as the
real purchaser, was, as president, active in the bank's
banking house in the conduct of its current affairs, and
thus had it within his power, it is fair to assume, to
have this credit entered in Ashe's favor by himself pro-
viding the funds and causing proper entries to be
made, without Ashe's suspicions being aroused there-
by. If we look to the facts surrounding the first trans-
action to shed light on this second deal, then Ashe had
seen that first stock transfer consummated and the
stock passed on to Hutchinson, which act Ashe would
naturally (as he testifies he did in fact) relate to Gass
as seller, without question being raised as to any part
of the transaction by any official of the bank, so far
as the proof shows. Ashe, it should be remembered,
was not at the time of the second sale a director in the
bank.

Judge Dillon, in his opinion in the case of *Johnson*
v. *Laflin*, supra, in the circuit court, clearly demon-
strates that, as a stockholder of the bank, Ashe was not
bound to take notice of the bank's books of account, or
of the way in which the bank in fact carried and dealt

with the shares. *Bargate* v. *Shortbridge,* 5 H. L. Cas., 297, 323; *Taylor* v. *Hughes,* 2 Jones & L., 24; *Ex parte Bagge,* 13 Beav., 162, and other cases there cited; and see *Wallace* v. *Bank,* 89 Tenn. (5 Pickle), 630, 659, 15 S. W., 448, 24 Am. St. Rep., 625.

In decreeing against the defendant, the chancellor erred; reversed, with decree here in conformity with the rulings embodied in this opinion.