[Hall & Farley, Trustees, v. Henderson;

Henderson v. Hall & Farley, Trustees.]

judge, etc., and on the original appeal, the judgment of the court below will be reversed and the cause remanded.

Affirmed on cross appeal.

Reversed and remanded on original appeal.

126  449
140  348
126  449
143  474
143  481

# Hall & Farley, Trustees, *v.* Henderson,

### and

# Henderson *v.* Hall & Farley, Trustees.

*Bill in Equity by Judgment Creditors of a Corporation to reach Equitable Assets.*

1. *Equity pleading; multifariousness of bill.*—A bill in equity may be filed in a double aspect, embracing alternative averments for relief, when each aspect entitled the complainant to substantially the same relief, and the same defenses are equally applicable to each phase of the bill.

2. *Same; right of judgment creditor of corporation to maintain bill to reach equitable assets; multifariousness.*—Where in a bill filed by a judgment creditor of an insolvent corporation with a return of execution of "no property found," to subject equitable assets of the corporation to the payment of the judgment, it is alleged in one aspect that the defendant is a stockholder of said corporation, holding unpaid subscription to the capital stock, which by fraudulent arrangement with the officers of the corporation appear to be paid, and in another aspect it is averred in said bill that by a fraudulent collusion with the same officers of the corporation, the defendant, who was himself a director and treasurer of said company, sold his stock therein to said officers, and in payment for said stock received assets of the corporation, knowing that no consideration had been paid therefor by the ostensible purchasers, and in the prayer for relief as to the first aspect of the bill, it is asked that the unpaid subscriptions be subjected to the payment of its debts, and, as to the other aspect, it is asked, in an alternative, if the subscription has been paid, that the defendant be made to pay out of the assets of the corporation received by him in payment of the stock sold to the other officers, an amount equal to the complainant's debt,—such bill is not multifarious, in-

29

[Hall & ·Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.] ·

consistent or repugnant, since each aspect of the case entitled the complainant to substantially the same relief; nor is such bill subject to demurrer as to its alternative phase, in that it fails to show when the assets were received by the defendant; what the assets consisted in, how they were received, and whether all were received at one time or at different times.

3.  *Corporations; liability of stockholder to creditor for assets of corporation received in payment of his stock.*—Where the officers of a corporation purchase the stock of a shareholder in said corporation for the company, and the selling stockholder is paid for his stock out of the assets of the said corporation, with notice, such sale is voidable at the instance of the creditors of the corporation as a fraud upon them, if by such transaction the corporation's ability to pay its debts is impaired; and the assets of a corporation so paid to the selling stockholder can be subjected in his hands to the payment of the claims of the creditors of said corporation.

4.  *Same; validity of judgment rendered in favor of receiver, after his discharge on a bill filed by trustees to reach equitable assets of a corporation.*—Where a receiver of a national bank which has suspended business institutes a suit upon a claim in favor of said bank, and pending such suit, the receiver is discharged, and the bank is authorized to resume business, and thereupon its claims of indebtedness are delivered to trustees with ,authority to collect the same, among which is included the claim constituting the foundation of the suit by the receiver, a judgment rendered in said suit in favor of such receiver, after his discharge, and after the transfer of the assets to the trustees, not being void on its face, will be presumed to be a valid judgment on collateral attack in a bill filed by such trustees to subject equitable assets alleged to have been converted by a former stockholder to the payment of such judgment; and where, in such bill, the receiver, in whose favor the judgment is rendered, is made a party complainant, there is removed the necessity of any averment or proof of the formal transfer or assignment of the judgment to the trustees.

5.  *Equity pleading; right of trustees to maintain suit without cestui que trust being made party.*—Where claims of indebtedness and other assets of a corporation are transferred to trustees of said corporation with authority to collect the same, on a bill filed to subject equitable assets of said corporation, alleged to have been fraudulently converted by a former stockholder to the payment of one of said claims, the *cestui que trust* of said trustees is not a necessary party to the suit.

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

6. *Right of judgment creditor to subject equitable corporate assets wrongfully converted to the payment of his debt; insolvency of corporation immaterial.*—Where the stockholder of a corporation, who is a director and treasurer of such company, sells his stock to other officers of the corporation, and in payment thereof receives the assets of the corporation, knowing, or under such circumstances as to put him on inquiry that would have disclosed, that the money paid to him for his stock was the money of the corporation in consideration of the sale by him of the stock either directly to the company or indirectly to it through the purchasing officers, in a suit by a judgment creditor of said corporation, seeking to subject the equitable assets of said corporation so wrongfully converted by such selling stockholder to the payment of the judgment debt, it is immaterial whether or not said corporation was insolvent at the time of said sale of defendant's stock, since the transaction was fraudulent as to the creditors of the corporation, whether it was actually insolvent at the time the bargain for the sale of stock was made or not.

7. *Same; same; estoppel.*—Where a stockholder of a corporation who is a director and treasurer of said company, sells his stock to another officer of said corporation for the company, and knowingly receives in payment thereof assets of said corporation, retaining the stock as collateral security for the notes given for the deferred payments, and subsequently while a part of the purchase price still remains unpaid, he delivered to the purchaser the certificates of stock, and received from him certain bonds to be held as collateral security of the stock so delivered, the fact that such purchaser as an officer of said corporation transferred the stock so received to a bank that was a creditor of the corporation, as collateral security for its corporate debt, does not estop such creditor bank after judgment in its favor on said debt from subjecting the equitable assets of the corporation received by said selling stockholder in payment of his stock to the payment of its judgment indebtedness; nor does the fact that said bank in the usual course of its business received from the selling stockholder for collection notes given to him by the purchaser in payment of said stock and in payment of said notes received from the purchaser checks signed by him as officer of said corporation upon a deposit with the bank in the name of the corporation, and that such checks were paid out of such corporate funds so deposited, work an estoppel against the creditor bank, preventing the collection of its claim in a suit against the selling stockholder.

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

8. *Corporation; knowledge of officers; presumption arising from entries in corporate books.*—That which the directors of a corporation, by proper diligence, ought to know about the business and general course of dealings of the corporation, they will be presumed to know in any contest between them and third parties; and, therefore, a stockholder in a corporation, who is a director and treasurer of the company, is presumed to know the facts disclosed by the entries in books of the corporation which his duty as treasurer requires him to keep, and he cannot as against creditors of the corporation avoid the probative force of such entries by proof of his dereliction of duty or negligence in not keeping said books.

9. *Same; same; same.*—When a stockholder in a corporation,. who is a director and treasurer of the company, sells his stock to the president and another director of said corporation, and takes their notes for the purchase price, which were subsequently paid with the assets of said company, in a suit by a judgment creditor of said corporation against said former stockholder and treasurer, seeking to subject to the payment of its judgment the corporate assets, alleged to have been knowingly and fraudulently converted by the defendant, upon an issue as to whether the sale of the stock by the defendant, was *bona fide* as to the purchasers, or was made indirectly through them to the corporation, the entries in the book of the company which it was the defendant's duty to keep showing that the notes for the purchase price of said stock were given by the purchasers for the corporation, and also showing the making of several renewal and extension notes, and that the assets of the corporation were used to pay said several notes, are admissible in evidence, and show a *prima facie* sale by the defendant to the corporation, and raise a presumption of notice to the defendant of said sale and that the stock was paid for with assets of the corporation, and the probative effect of such evidence cannot be overcome by the statement of defendant and the purchasers that the sale was made to the latter and not to the corporation.

APPEAL from the City Court of Montgomery, in Equity.

Heard before the Hon. A. D. SAYRE.

On June 23, 1896, J. L. Hall and L. B. Farley, as trustees, filed their bill of complaint against Fox Henderson, the Alabama Terminal & Improvement Company, and the Farley National Bank. In this bill it

was averred that the Alabama Terminal & Improvement Company, a corporation under the laws of Alabama, and doing business in said State, opened an account with the Farley National Bank on March 6th, 1890, and commenced obtaining loans and discounts from such bank; that this business continued until August 21st, 1891, when the Alabama Terminal & Improvement Company was indebted to said bank in the sum of $151,000, and that the failure of said A. T. & I. Co. to pay such indebtedness caused the suspension of said Farley National Bank on the day just named.

Thereafter the comptroller of the currency of the United States, in pursuance of the laws of the United States, appointed one H. M. Hall as receiver of said bank, authorizing him to take possession of the books and assets of every kind of said bank, and collect all debts due and claims belonging to it, and said H. M. Hall accepted such appointment, took possession of the books, assets, etc., of said company, and thereafter, on January 25, 1892, instituted a suit as such receiver against the A. T. & I. Co. to recover the indebtedness of said company to the Farley National Bank. On Oct. 23, 1892, a judgment was rendered in said suit against said Alabama Terminal & Imp. Co. for the sum of $117,891.47; the debt having been reduced by payment made or note given for a portion thereof during said suit. Execution was duly issued upon this judgment, and was returned by the sheriff "no property found," and said judgment remained in full force and effect, and wholly unsatisfied at the time of the filing of said bill.

On Feb. 15, 1892, the comptroller of the currency discharged the receiver, ordering the restoration of the Farley National Bank to the possession of its books and assets, and authorizing it to resume business. Thereafter, on February 23, 1892, the said bank assigned and transferred to the complainants. J. L. Hall and L. B. Farley, as trustees, the said debt of the Alabama Terminal & Improvement Co.

In the organization of the Alabama Terminal & Improvement Co., the defendant, Fox Henderson, sub-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

scribed for 300 shares of its capital stock, amounting to $30,000, and made his promise in writing for the payment thereof. The payment of the note of Henderson, which was given for the subscription of $30,000 to the capital stock of the Alabama Terminal & Improvement Co., was conditioned upon the completion of the Alabama Midland Railroad from one of the Southern terminal points of said road to a point within one mile of the center of the city of Montgomery on or before the 1st day of October, 1890, and the publication of the decision of the board of directors of such completion. This condition was complied with, and the Alabama Midland Railroad was completed, as stipulated. It was then averred in the bill that the complainants were informed and believed that Fox Henderson claimed that, after paying for his stock in the Alabama Terminal & Improvement Company, he sold and transferred it to one J. W. Woolfolk and A. C. Saportas. J. W. Woolfolk was president and general manager of the A. T. & I. Co., and A. C. Saportas was a director thereof, and it was averred in the bill that he was under the influence and control of the said Woolfolk, in reference to the management of the business of said A. T. & I. Co. The management of the business and control of the affairs of the A. T. & I. Co. was entirely in the hands of J. W. Woolfolk. This fact was known to Fox Henderson, who was himself a director and treasurer of said A. T. & I. Co., and who, it was averred in the bill, co-operated with said Woolfolk in the management of said company. It was then averred in the bill that the defendant, Fox Henderson, as treasurer and a director of the Alabama Terminal & Improvement Company, well knew that Woolfolk was at the time of the transfer of the former stock to him, largely indebted to said company for his own subscription and otherwise, and that said company was largely indebted, and hastening to insolvency; that said Henderson well knew that Woolfolk was at that time carrying out a scheme, and was drawing out a large amount of the assets of the company by buying up at par in the name of said company, large amounts of the stock of the subscrib-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

ers to the capital stock, and paying for the same with the assets of the company, without any authority whatever —the persons thus favored by said Woolfolk being the brothers, relations, partners and neighbors of the said Fox Henderson.

The bill then avers as follows: "That the said Woolfolk, as president and general manager of the said company, having incurred large debts for said company, and being unable to use to advantage the assets in the hands of said company, owing to the financial condition of depression in the country, proposed to a number of subscribers for the capital stock of said company, residing at Troy, Alabama, among whom were brothers, relatives, partners and acquaintances of said Fox Henderson, and to the said Fox Henderson himself, that they could get rid of their stock in said company and avoid liability therefor and at the same time provide for his present need of money, by paying in cash their subscription for stock and by his buying the stock thus paid for in the name of and for the company paying for the same in assets of said company in his hands at a certain price—generally in bonds of the Alabama Midland Railroad, at eighty-five cents on the dollar, in his hands belonging to said company. This plan the said Woolfolk carried out with a number of said subscribers, of all of which the said Fox Henderson was well informed.

"That in the case of the said Fox Henderson, on account of his relations to said company, or for some other reason, for his supposed security, it was arranged that he should pay up his stock subscription of $30,000 in full, and that J. W. Woolfolk and the said Saportas should buy his stock and execute to him their notes, each for $10,000, due respectively 30, 45 and 60 days from date, and that these notes should be charged up to and paid by said Alabama Terminal & Improvement Company as a purchase by it of said stock."

And so orators aver the said plan was carried out. The said Woolfolk and Saportas gave their three notes for the amounts and for the time above stated, for the stock; the said Henderson retaining the stock as collateral security for their payment, and on the same day,

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

to-wit, 5th January, 1891, the said notes were entered
on the books of said company in the bills payable ac-
count of the company, as follows:

Bills Payable.                                  Dr.
Jan'y. 5, 1891, 3 notes, acct. of A. C.
Saportas and J. W. Woolfolk for the
A. T. & I. Co., for $10,000 each,
due as follows:
One note 30 days after date.........$10,000
One note 45 days after date.......... 10,000
One note 60 days after date.......... 10,000
                                     ————$30,000

The corresponding entry on the credit side of the
cash book of said company being:

Investment account.                             Dr.
Bought of Fox Henderson, 300 shares
capital stock of A. T. & I. Co., in sus-
pense .........................$30,000

The complainant then avers that said notes were re-
newed from time to time, and continued upon the books
of said company as its obligations, and were from time
to time paid in part out of the fund of said company,
"of all of which the said Fox Henderson had full knowl-
edge"; and that at the time of said payment the said
Henderson had good reason to know that the Alabama
Terminal & Improvement Company was largely in-
debted, if not wholly insolvent, and that the use of its
assets in the payment and discharge of said notes was a
fraud upon the creditors of said company, including
the complainants; that said Fox Henderson received all
the money and assets of said company in the manner as
stated above, after January 5th, 1891—the sum of, to-
wit, $30,000—which sum is still due, with interest. The
bill then continues as follows: "And orators further
aver that said Fox Henderson never in fact paid up
his said subscription in full; that the said Woolfolk,
in making settlement with him, allowed him credit for
$15,000, or other large sum, which he was not le-
gally entitled to, and that such amount, with interest,
in addition to said sums received by him from the as-
sets of said company, since the said 5th of January,

1891, is still due and unpaid upon said subscription to the capital stock of said company by said Fox Henderson. So that orators aver that the said Fox Henderson has never in fact made any *bona fide* payment of his said subscription to the capital stock of said company, but that he still owes the same, and besides is indebted to the amount of $30,000, or other large sum of money, assets of the said company, received by him since the said 5th day of January, 1891. But if orators are mistaken in the foregoing averment as to the subscription to the capital stock of said company not having been paid, they aver that subsequent to the 5th day of January, 1891, the said Fox Henderson, being a director and treasurer of said company, received assets of said company amounting to $30,000, or other large sum, knowingly and without proper or legal consideration to said company, which he is liable for, with interest." The prayer of the bill was that upon the hearing of the cause, the amount due the complainants might be ascertained, and that the said Fox Henderson "might be decreed to pay all such sums as he may be liable for on his said subscription to the capital stock of the said Alabama Terminal & Improvement Company, and for the money and assets of the said Alabama Terminal & Improvement Company improperly received and converted by him, and that orators' said debt may be paid out of the same." There was also a prayer for general relief.

To this bill the defendants filed several demurrers, which, upon submission of the cause, were sustained. Upon the decree sustaining such demurrers, the plaintiff prosecuted an appeal to the Supreme Court. On such appeal the decree sustaining the demurrers was reversed, and the cause was remanded. The report of this case on appeal is found in 114 Ala. 601. After remandment of the case the bill was amended by adding to the averment relating to the transfer and assignment by the Farley National Bank of its debt against the A. T. & I. Co., the following further averment: "And by said transfer and assignment invested orators, with all the right and powers of the said Farley National

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

Bank in reference to said debt and against all persons in any manner liable therefor, including the right to collect the same for the benefit of the stockholders of said bank." The bill was also subsequently amended by making H. M. Hall a party complainant.

In his answer, the defendant, Fox Henderson, avers that he subscribed for 300 shares of the stock of the Alabama Terminal & Improvement Company, and that he paid the said company the full amount of his subscription, amounting to $30,000. The payment of his note for said shares of stock in the Alabama Terminal & Improvement Company was a *bona fide* payment of the full amount due, and he expressly denies that he owes anything to said company on account of his subscription. The defendant, in his answer, admits that he sold his 300 shares of the capital stock of the A. T. & I. Co., and which had been fully paid for by him, to J. W. Woolfolk and A. C. Saportas, on Nov. 20, 1899; and he further avers that at the time of said sale Woolfolk and Saportas executed and delivered to him their note for $30,000, which were due and payable 45 days after date, and that such sale made by him to Woolfolk and Saportas was *bona fide;* that at the time of such sale, and by agreement with said Woolfolk, who negotiated the purchase, he retained the 300 shares of stock, and said Woolfolk delivered to him 150 shares more of the stock, all of which was to be held as collateral security for the note for $30,000; that such sale of the stock was not a colorable transaction, and made for the purpose of hindering, delaying and defrauding the creditors of the said A. T. & I. Co.; that said company had nothing to do with the transaction, and was not to pay anything on account of said stock, and there was no agreement or understanding between the parties to such sale that any part of the note of Woolfolk and Saportas to Henderson was to be paid out of the money or assets of the A. T. & I. Co., and that as a matter of fact nothing was paid to him on said note or on account of the sale of said stock out of the money and assets of said company. It was further averred by the defendant Henderson in his answer that at the time

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

he sold his said shares of stock to Woolfolk and Saportas, in November, 1890, the Alabama Terminal & Improvement Company was entirely solvent, and had a good credit and standing, and that the capital stock of the said company was worth par on the market. Further answering said bill, the said Henderson averred that Woolfolk and Saportas failed to pay their note for $30,000 at maturity, and at their request, he extended the payment of said amount by surrendering to them their note for $30,000, upon the execution and delivery to him by Woolfolk and Saportas of their three notes for $10,000 each, due 30, 45 and 60 days after date respectively; that at the time these three notes were executed he had no knowledge of any character that said Woolfolk and Saportas had sold or attempted to sell the 300 shares of the stock which he had sold to them to the Alabama Terminal & Improvement Company; that he had no knowledge that there was any entry made on the books of said company of any character concerning said transfer of said three notes, and that he had no information or knowledge of such entries until two years or more afterwards; that he did not consent, directly or indirectly, to the sale of the said stock to the Alabama Terminal & Improvement Company by Woolfolk and Saportas, and that he did not receive any money or other thing of value from the Alabama Terminal & Improvement Company in payment of said stock, and that if any of the money which was paid to him by Woolfolk and Saportas in payment of the stock purchased by them was paid out of the assets or money of said A. T. & I. Co., it was done without his knowledge or consent, and that for all the money which was paid to him he gave Woolfolk and Saportas credit on the debt which they owed, without any knowledge or information of any character that it was not their money, which they had a right to pay on said debt; that he had never received from either Woolfolk, Saportas or any other person, any money, property, assets or other thing of value belonging to the A. T. & I. Co., without having paid full consideration to the said A. T. & I. Co. for the same.

Further answering said bill, the defendant Henderson averred that on March 17, 1891, he transferred, as-

signed and delivered to J. W. Woolfolk the 300 shares of the capital stock of the Alabama Terminal & Improvement Company, which he had sold to the said J. W. Woolfolk and A. C. Saportas, and which he held as collateral security; that this transfer to Woolfolk was at the request of Woolfolk and Saportas; that on March 31, 1891, said Henderson, at the request of Woolfolk, upon the delivery to him of the said 300 shares of stock, executed and delivered a transfer and assignment of said 300 shares of capital stock to the Farley National Bank of Montgomery; that said 300 shares of stock were received by said Farley National Bank as collateral security for the debt upon which this cause of action is founded, and that the Farley National Bank retained said 300 shares of stock, either in its own name or the name of John W. Hess of New York, up to and until the same was delivered to the complainants in this suit, as trustees; and that said complainants, as such trustees, now have said stock in their possession and under their control, holding it for their use and benefit. It was further averred "that if the said J. W. Woolfolk and A. C. Saportas, or either of them, used the money or assets of the Alabama Terminal & Improvement Company in payment for the said 300 shares of stock, or any part thereof, that the said Farley National Bank and said complainants have held either in their name or in the name of some other person, and by their direction, and now hold and use said stock after having had full information that said stock was paid for in whole or in part by the said Woolfolk and Saportas, or one of them, out of the money or assets of said A. T. & I. Co., without having authority so to do." "And respondent avers that the said complainants, with full knowledge of the facts upon which a recovery in this cause is sought, if such facts exist, have never surrendered or offered to surrender, said shares of stock, or any part thereof, to this respondent, nor have they surrendered, or offered to surrender, such shares of stock, or any part thereof, to the said J. W. Woolfolk and A. C. Saportas, but retain the said shares of stock and claim a right and an interest therein. Wherefore respondent avers that said

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

complainants should not recover in this case, the monies which were paid to this respondent, if any money was so paid, by the said Woolfolk and Saportas, or either of them, for said shares of stock out of the assets or monies of the said A. T. & I. Co., while the said complainants have received and now retain the fruits of said transaction, viz.: the shares of stock so paid for with said money by said A. T. & I. Co., if the same was so paid." Defendant further answering, averred that while he was a director and treasurer of the said A. T. & I. Co., as a matter of fact, he was merely the nominal treasurer of said company; that he did not have control of the books of said company, nor did he have control of the assets or funds of said company; that the books of said company were kept in Montgomery, Ala., and that said J. W. Woolfolk had possession and control of the assets of said company and paid out the same in connection with the management and control of the business thereof; that Woolfolk had control of the books, and they were kept by persons employed by him, and under his direction, and the defendant, Henderson, never at any time had the books in his possession, never made any entries therein or saw the books of the company until long after the transactions in issue, and that he knew nothing of the entries made upon said books, and had never authorized or directed any entries to be made therein, except the transfer of his stock on the books of said company to Woolfolk and Saportas. In the subsequent amendment to his answer, the defendant further averred that if any of the money of the Alabama Terminal & Improvement Company had ever been paid to him it was on the note of Woolfolk and Saportas, given for the payment of the stock sold to them, which notes were sent to the Farley National Bank for collection in the due course of business; that if in collecting said notes, the said Farley National Bank received from Woolfolk, or any other person, any of the money in payment of said note or notes out of the moneys of the Alabama Terminal & Improvement Company, they did so without authority from respondent Henderson, and without ever giving respondent any notice or infor-

mation that said notes had been paid in such manner; that the Farley National Bank, upon collection of said notes, delivered the same to Woolfolk, together with the collateral security which accompanied said notes, and that thereby Woolfolk and Saportas were discharged from all liability on account of the debt which they owed the defendant; that if the money with which the notes were paid belonged to the Alabama Terminal & Improvement Company, the bank exceeded its authority in receiving said money in payment of said notes, and failed to discharge the duty it owed to the defendant Henderson, of communicating the knowledge of the fact to him that the money of the said A. T. & I. Co. was used in the payment of said debt; therefore, the complainants, who claim their right and title through the Farley National Bank, with full knowledge of all the facts concerning said transaction, are not entitled to take advantage of their own wrong and breach of duty to this defendant on account of said transaction. That the defendant Henderson, at the time of the payment, had no knowledge of the fact that the money of the Alabama Terminal & Improvement Company was being used to pay such notes, if such was the fact, and that he had no knowledge of any other fact that would put him on inquiry in respect to such matters, but that the notes were paid in checks, not signed by the Alabama Terminal & Improvement Company, or any persons for it, in such manner as to make such checks binding upon the company, but were checks signed by J. W. Woolfolk, J. W. Dimmick and George B. Shellhorn, respectively, upon which the A. T. & I. Co. were not liable, so far as appeared on the face of the checks. That the said checks were paid by the Farley National Bank, and if they were charged to the Alabama Terminal & Improvement Company it was without authority from the defendant Henderson, and such charge was illegal and wrong.

As a part of his answer, the defendant Henderson demurred to the bill upon the following grounds:

"1. Said bill is filed in the alternative or in a double aspect, presenting inconsistent and repugant claims for relief. The relief that could be granted in one as-

pect would be materially variant from the relief that could be granted in the other, in this: Said bill in one of its aspects charges that respondent has never in fact made any *bona fide* payment of his said subscription to the capital stock of the Alabama Terminal & Improvement Company, but still owes the same; and in the other aspect, it charges that if the *bona fide* payment of the stock subscribed for was made, then he is liable for the assets of the company, with interest thereon, received by him knowingly, without proper or legal consideration to said company.

"2.   Said bill is filed in a double aspect upon antagonistic rights.   The relief prayed for in one phase of no *bona fide* settlement having been made is to hold the respondent liable under his contract of subscription, and the relief prayed for in the phase of respondent being a trustee *in invitum* is to hold him liable for his tort in converting the assets of the company.

"3.   Because there is a misjoinder of causes of action, in this, that the bill of complainant seeks to recover an amount alleged to be due by the respondent on his contract for the subscription to the shares of stock in the A. T. & I Co., and also seeks to recover of respondent money or assets of the A. T. & I. Co., alleged to have been wrongfully received and converted by him, and held by him as a trustee *in invitum,* which said several causes of action call for decrees of separate and distinct natures.

"4.   Said bill is multifarious in this, that it seeks to recover an amount alleged to be due by respondent on his note or contract for subscription for shares of stock in the A. T. & I. Co., and also seeks to recover of the respondent for monies or assets of the A. T. & I. Co. alleged to have been wrongfully received and converted by the respondent, which two causes of action call for decrees which are inconsistent or of different nature.

"5.   Said bill is without equity in this, it is not shown by said bill that the judgment against the Alabama Terminal & Improvement Company, in favor of H. M. Hall, Jr., receiver, was ever transferred to complainant, either by said H. M. Hall, as receiver, or by

· [Hall & Farley, Trustees, v. Henderson;·
Henderson v. Hall & Farley, Trustees.]

the Farley National Bank, prior to the filing of the bill · of complaint in said cause.

"6. Said bill of complaint is without equity in this, it is shown by said bill that the judgment obtained against the Alabama Terminal & Improvement Company, the foundation of complainant's cause of action, was obtained in a suit commenced by and in favor of H. M. Hall, Jr., as receiver of the Farley National Bank, in the city court of Montgomery, Ala., and it is shown by said bill that after the commencement of said suit, and prior to the rendition of said judgment, on, to-wit, the 23d day of October, 1892, the said H. M. Hall was discharged as such receiver, and his right to maintain said suit against the said A. T. & I. Co. terminated on, to-wit, the 15th day of February, 1892, and it is not shown by said bill that said judgment was rendered in favor of any then existing party plaintiff.

"7. Said bill of complaint is without equity in this: It is shown on the face of said bill that the judgment, the foundation of complainants' cause of action, was obtained in favor of H. M. Hall, Jr., as receiver of the Farley National Bank, of Montgomery, Ala., against the A. T. & I. Co., and it is shown on the face of said bill of complaint that the right of said H.M. Hall, as said receiver, to maintain said suit against the Alabama Terminal & Improvement Company terminated on, to-wit, the 15th day of February, 1892, prior to the rendition of said judgment, and it is shown by said bill that the Farley National Bank parted with all right, title and interest to the subject-matter of said suit by transferring and disposing of the debt which was the foundation of said suit, on, to-wit, the 23d day of February, 1892, and it is not shown by said bill that said suit against the Alabama Terminal & Improvement Company was prosecuted for the use of or in the name of the complainant, and it is not shown by said bill that said judgment against the said A. T. & I. Co. has ever been transferred or assigned to plaintiff, or that they are in any manner connected therewith, in such manner as to have the right to prosecute the right of action in

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

this case as judgment creditors of the Alabama Terminal and Improvement Company.

"8.  Said bill of complaint fails to show by what authority the complainants, as trustees have the right to sue and maintain the bill of complaint against the respondent, Fox Henderson, in this case.

"9.  The bill of complaint fails to show for whom the complainants are trustees, and fails to give the names of the *cestuis que trust* of the complainants, for whose benefit this cause is prosecuted, and fails to show who are the stockholders, or give the names of the stockholders of the Farley National Bank, for whose benefit this suit is prosecuted by the complainants, as trustees.

"10.  The bill of complaint fails to show that the stockholders of the Farley National Bank, or *cestuis que trust* of the complainants, have ever vested the complainants with any equitable or legal right to sue, and maintain a bill of complaint in this case in their own names as trustees.

"11.  This respondent demurs to so much of the bill of complaint as seeks to recover from this respondent the alleged amount, to-wit, $15,000, due by him on his alleged subscription note for stock to the Alabama Terminal & Improvement Company, upon the ground that it is not shown by said bill of complaint that the complainants are judgment creditors of the Alabama Terminal & Improvement Company, and it is shown by said bill of complaint that the complainants have a plain and adequate remedy at law for the collection of the amount due by this respondent on his said subscription note for shares of stock to the Alabama Terminal & Improvement Company.

"12.  This respondent demurs to so much of said bill of complaint as seeks to recover from this respondent the alleged amount of, to-wit, $25,000, alleged in said bill to have been received by this respondent, of moneys or assets of said Alabama Terminal & Improvement Company, and held by this respondent upon the ground that it is not shown by said bill that this respondent received any of said money or assets of the Alabama

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

Terminal & Improvement Company, sought to be recovered of this respondent in this suit prior to the date of the filing of the bill of complaint in this cause."

The evidence for the complainants tended to substantiate the averments of the bill, showing the organization of the A. T. & I. Co.; the fact that Fox Henderson was a director and treasurer of said company; that by reason of said company's failing to meet its obligations to the Farley National Bank, amounting to $151,000, said bank was compelled to suspend business, and was put in the hands of a receiver, H. M. Hall being appointed such receiver; that said Hall, as receiver, brought an action against the A. T. & I. Co., in which a judgment was rendered in his favor for $117,891.47, the other part of the debt having been liquidated prior to the rendition of the judgment; that pending said suit, the comptroller of the currency authorized the resumption of business by the Farley National Bank, and its assets were delivered to its officers, and that subsequently, by resolution of the board of directors, J. L. Hall and L. B. Farley were appointed trustees, and there was delivered to them the debt due the Farley National Bank by the A. T. & I. Co., and they were invested with the rights and powers of the Farley National Bank in reference to said debt, and with the right to collect the same for the benefit of the stockholders of said bank. It was further shown by the evidence that Fox Henderson subscribed for $30,000 of the capital stock of the Alabama Terminal & Improvement Company, and that he paid for said subscription; that after having paid for his subscription, he sold his stock to J. W. Woolfolk and A. C. Saportas; the evidence of the complainants tending to show the knowledge that the purchase, while nominally in the name of Woolfolk and Saportas, was in fact by the A. T. & I. Co.; that for the stock so purchased Woolfolk and Saportas executed their note for $30,000, payable forty-five days after date; that upon the maturity of said note, they were unable to pay the same, and Henderson agreed to extend the indebtedness upon Woolfolk and Saportas executing three separate notes for $10,000, each payable 30, 45 and 60 days after date;

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

that upon the maturity of these several notes, partial payments were made, and new notes executed and extensions granted; that these partial payments were made with the money and assets belonging to the Alabama Terminal & Improvement Company, which fact was known to Henderson; that the payments were sometimes made in money and sometimes by checks drawn on the Farley National Bank, which were signed by J. W. Woolfolk, president; and some by J. W. Dimmick, vice-president; all of which checks were paid out of funds deposited in the Farley National Bank to the credit of the Alabama Terminal & Improvement Company. It is further shown by the evidence for the complainants that entries for the renewal and extension of the notes executed by Woolfolk and Saportas, as well as all the payments made by the corporation to Henderson, were made upon the cash book of the Alabama Terminal & Improvement Company, which cash book it was the duty of the treasurer of the corporation to keep. It was further shown that during the time covered by these transactions that J. W. Woolfolk was president of the Alabama Terminal & Improvement Company, and exercised absolute power and control over its affairs, and that after the completion of the Alabama Midland Railroad by said company, large amounts of the assets of the said A. T. & I. Co. were diverted by said Woolfolk to the building of the Montgomery, Tuscaloosa & Memphis Railroad; that such diversion was objected to by Fox Henderson and other stockholders in the city of Troy, and that it was for this reason that the stock of Henderson and the other Troy stockholders was purchased. At the time of the purchase of the Henderson stock by Woolfolk and Saportas, they were insolvent, and were largely indebted to the Alabama Terminal & Improvement Company. Henderson, while elected to the office of treasurer of the Alabama Terminal & Improvement Company, was shown by the evidence to have been only nominally treasurer, and the treasurer's books, including the cash book of said company, were kept by one George B. Shellhorn, who was a clerk under the control and influence of J. W. Woolfolk. Dur-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

ing the time covered by the transactions involved in this suit, Henderson had no funds in his hands as treasurer of said company, and yet he allowed Woolfolk to draw on him as such treasurer for the purpose of obtaining the use of money from the Farley National Bank; that in order to procure such money Woolfolk, as president of the A. T. & I. Co., would at Montgomery, draw drafts on said Fox Henderson as treasurer of said company, at Troy; that he would then take these drafts to the Farley National Bank and have them discounted, as founded on real transactions, and the money would go to the credit of the A. T. & I. Co. He would use the money so obtained in the purchase of stock of the A. T. & I. Co., and in the construction of the M. T. & M. R. R., and three or four days before the drafts would mature he would make other and larger drafts in order to cover the interest and exchange to the banking house of Josiah Morris & Co., or other banking house in Montgomery, and deposited by check on the proceeds at the Farley National Bank the cash so obtained to the credit of Fox Henderson, as treasurer, in order that he might meet the first draft. This was repeated, the checks and the drafts grew larger and larger and more frequent, until he obtained from the Farley National Bank on floating drafts the sum of $151,000, out of which he paid for the Henderson stock, and accomplished other schemes; that it was the result of this "kiting" operation that caused the Farley National Bank to suspend business; that in this manner several hundred thousand dollars of checks were drawn in Montgomery on Fox Henderson, as treasurer, and discounted at the Farley National Bank in three months without any money ever being in the hands of Fox Henderson, as treasurer, to pay for the same.

George B. Shellhorn testified in his deposition to the entries upon the cash book of the A. T. & I. Co., of the renewals and extensions of the notes executed by Woolfolk and Saportas to Henderson, as well as all the payments made by the corporation to him, and further testified that all payments made to Henderson, on the purchase of his stock, were made out of the assets of the

OF ALABAMA.

469

Alabama Terminal & Improvement Company, and the books of the A. T. & I. Co. show such use of the assets for said purpose; that the books of said company also showed that J. W. Woolfolk used the assets of the company in the construction of the M. T. & M. R. R. Said Shellhorn further testified that during the time Fox Henderson was being paid for the stock which he sold to Woolfolk and Saportas out of the assets of said A. T. & I. Co., the funds so used in making such payments were raised by "kiting" operations; that these operations were carried on in the following manner: "When a draft drawn on Fox Henderson, treasurer, was about to mature, there would be deposited in the Farley National Bank another draft for an amount large enough to pay the draft just matured, and also the interest and exchange on the new paper. When that draft matured, the operation was repeated, and so on from time to time as the papers matured. The Farley Bank failed on August 22, 1891, and its failure was brought about by a hitch in providing for these 'kiting' drafts." It was also shown by the evidence that Fox Henderson sent some of the renewal notes executed by Woolfolk and Saportas to the banking house of Josiah Morris & Co., for collection; that these notes were paid by Woolfolk drawing drafts signed by him as president, upon the Farley National Bank. It was also shown that some of the other renewal notes of said Woolfolk and Saportas were sent to the Farley National Bank for collection, and that these notes were paid by Woolfolk drawing his draft on the Farley National Bank, signed by J. W. Woolfolk, president; and said drafts were paid out of the money on deposit in the Farley National Bank, to the credit of the Alabama Terminal & Improvement Company. The defendant's testimony tended to substantiate the averments of his answer.

Fox Henderson, as a witness, testified that the sale of his stock was a *bona fide* sale thereof to J. W. Woolfolk and A. C. Saportas; that he had repeatedly declined to sell said stock to the A. T. & I. Co.; that so far as he knew, he was paid for said stock by Woolfolk and Saportas, and none of the assets or money of the A. T. &

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

I. Co. was used for the payment of said stock; that while he was treasurer of said company, he was only nominally so, although there was a salary provided for him as such officer of $900; that the treasurer's books of said company were kept by George B. Shellhorn, who was in the office and under the control of J. W. Woolfolk; that he, Henderson, did not know of the entries upon the cash book or any other books of said company of the purchase of said stock from him, nor did he authorize any such entry; that it was two years after such transaction before he found out that such entries were made; that he never knew nor was he informed that the assets of the A. T. & I. Co. were used by Woolfolk in payment of the stock that was purchased by him; that before the payment in full of said stock he, at the request of said Woolfolk, delivered to him the certificate of stock, which was held by him as collateral security for the payment of the notes given for the purchase of the stock; that this stock was then transferred to the Farley National Bank as collateral security for the indebtedness of the Alabama Terminal & Improvement Company to said bank; that in the place of the stock which he held as collateral security for the notes of Woolfolk and Saportas there were delivered to him by Woolfolk bonds of the Alabama Midland Railroad Company.

Woolfolk, as a witness, testified that he never notified Henderson either of the entries made upon the cash book of the Alabama Terminal & Improvement Company, relating to the purchase of said stock, or of the fact that the assets of said company were being used for the payment of said stock; that so far as he knew Henderson was not aware of these facts. His other testimony tended to corroborate the testimony of said Fox Henderson. The other facts of the case necessary to an understanding of the decision on the present appeal are sufficiently stated in the opinion.

On the submission of the cause on the pleadings and proof, the chancellor overruled the demurrers which were interposed by the defendant, and held that the defendant Henderson was responsible to the complain-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

ants for the amount of the two notes, which were sent by said Henderson to the Farley National Bank for collection, and which were paid by checks on said bank, signed by J. W. Woolfolk, president. There was, thereupon, a final decree rendered in favor of the complainants against Henderson for the sum of $8,719.61, together with interest, amounting to $4,934.68, making a total liability of $13,654.29. From this decree the complainants appeal, and assign the rendition thereof as error, in that the court refused to charge Henderson with the amount which had been paid by Woolfolk out of the assets of the A. T. & I. Co., for the purchase of the stock. There was a cross-appeal prosecuted by defendant, Fox Henderson, who assigned as error the court's overruling the demurrers to the bill, and adjudging recovery by the complainants against the defendant, Fox Henderson.

GUNTER & GUNTER, WATTS, TROY & CAFFEY, and J. M. CHILTON, for Hall and Farley.—The Alabama Terminal & Improvement Company was, in fact, insolvent at the time of the transfer of his stock by the respondent, Henderson. The evidence as to the actual condition of the finances of the Alabama Terminal & Improvement Company at the time of the sale of his stock by the respondent Henderson is not very clear; but the only inference that can be drawn from it is that the company, although a going concern, was actually insolvent at that time. It appears that it was then indebted to the Farley National Bank; and that that indebtedness was not only never paid, but went on increasing constantly, until, ten months later, it resulted in the collapse of both concerns. Such a condition of affairs must mean insolvency, and nothing else.—*Toof v. Martin*, 13 Wall. 40 ; *Koechl v. Brewing Co.*, 26 App. Div. (N. Y.), 573.

2. The respondent Henderson had actual knowledge of the condition of the company, of the facts attending the sale of his stock, and of the source of payment for that stock. The only reasonable deduction that can be drawn from the evidence is that the respondent Henderson had actual knowledge of the condition of the

[Hall & Farley, Trustees, v. Henderson;

Henderson v. Hall & Farley, Trustees.]

company's affairs at the time he sold his stock; that the sale, while in form a sale to Woolfolk and Saportas, was in substance a sale to the company; and that the company's funds were used to pay the purchase price of the stock. There can be no question as to the respondent's knowledge of the source from which he was paid. The exhibits attached to Shellhorn's deposition, as well as the deposition itself, show that he received numerous checks of the company in payment of some of the notes given for the stock, endorsed them himself, and collected the money on them. And the entire correspondence was between Henderson and the acting treasurer of the company, Shellhorn. In the face of these facts it would be idle to attempt to deny that he did not know that he was receiving the funds of the company.—*Amer. Preserves Co. v. Investment Co.*, 7 Misc. Rep. (N. Y.), 509; *Wolff v. State*, 79 Ala. 201; *Loring v. Brodie*, 134 Mass. 453.

3. Irrespective of his actual knowledge of the affairs of the company and of the stock transaction, the respondent Henderson, as an officer of the company, is chargeable with knowledge of what appeared on the books of the company. There is some difference of opinion as to how far the directors and officers of a corporation are chargeable with knowledge of facts which appear on the books of a corporation, but it seems to be generally admitted that they are chargeable with such knowledge whenever there is any duty resting upon them to examine the books in the discharge of their official duties, or when they have reason to suspect that the books contain entries in reference to such matters.— *Merchants' Bank of Macon v. Taylor*, 21 Ga. 334; *Merchants' Bank of Lincoln v. Rudolph*, 5 Neb. 527; *Hubbard v. Weare*, 79 Iowa, 678; *First National Bank of Whitehall v. Tisdale*, 84 N. Y. 655; *Huntington v. Attrill*, 118 N. Y. 365; *Bedford v. Sherman*, 68 Hun. (N. Y.) 317; *Koechl v. Leibinger & Oehm Brewing Co.*, 26 App. Div. (N. Y.) 573; *Spellier Electric Time Co. v. Geiger*, 147 Pa. 399; *Olney v. Chadsey*, 7 R. I. 224; *Lane v. Bank of West Tenn.*, 9 Heisk. (Tenn.) 419; *Humph-*

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

*rey v. People,* 18 Hun. (N. Y.) 393; *Martin v. Webb,* 110 U. S. 7.

4. The respondent's stock was really purchased by the Alabama Terminal & Improvement Company, and he is liable for whatever funds of the company were paid out in pursuance of that purchase, since they were thereby diverted from application to the claims of creditors. There can be no question that the purchase of the respondent's stock was in substance, if not in form, a corporate transaction. It was entered on the books of the company as such; and the funds of the company were alone used in paying for it. This being the case, it was voidable as to creditors, because the corporation having become insolvent, it was a diversion of assets which should have been applied to the payment of their claims. Now, while it seems to be the rule in Alabama, in accordance with the general rule in the United States, that a corporation may purchase shares of its own stock, provided that no injury be done to creditors, (*Cooper v. Fredericks,* 9 Ala. 738), it is also admitted that such a purchase, if in fact injurious to creditors, may be set aside as a fraud done to them.—*Glenn v. Hatchett,* 91 Ala. 316; *Gill v. Bailes,* 72 Mo. 424; *Strong v. Brooklyn R. R. Co.,* 93 N. Y. 426; *Gillett v. Moody,* 3 N. Y. 476; *Hamor v. Taylor Eng. Co.,* 84 Fed. Rep. 392; *Burke v. Smith,* 16 Wall. 390; *Clapp v. Peterson,* 104 Ill. 26.

5. Even on the assumption that the transfer of his stock was to Woolfolk and Saportas individually, and not to the corporation, the respondent is still liable for the sums received by him in payment therefor, because the effect of the transaction was to withdraw assets of the corporation from the reach of its creditors. It is too well settled to admit of question that a transfer of stock by a stockholder to one who is insolvent or in failing circumstances, will not be permitted to stand as against creditors of the corporation, whenever the effect of the transaction is to relieve the transferror from liability to creditors.—*National Bank v. Case,* 99 U. S. 628; *Bowden v. Johnson,* 107 U. S. 251; *Stuart v. Hayden,* 72 Fed. Rep. 402; *Fostes v. Lincoln,* 79 Fed. Rep.

170; *National Carriage Mnfg. Co. v. Storey & Isham Commercial Co.* (Cal.), 44 Pac. Rep. 157; *Altman's Appeal,* 98 Pa. 50; *Nenney v. Waddell,* (Tex. Civ. App.) 25 S. W. Rep. 308; *Burt v. Real Estate Exchange,* 175 Pa. 619.

6.  Assuming that the purchase of the stock was a private and not a corporate transaction, the respondent is nevertheless liable for all sums received by him in payment for the stock, because they were corporate assets used to pay the private debt of the president. It ought not to need the citation of authority to show that the use of corporate assets to pay the private debt of an officer of a corporation can confer no valid title upon the recipient, irrespective of the question of his good faith. In such a transaction, he receives something to which his grantor has no title, and can confer none; and consequently the funds so received are liable to be recovered, although the recipient acted in perfect good faith and without the slightest knowledge of the source from which they were derived.—*Rogers v. Bachelor,* 12 Pet. 221; *Rogers v. Betterton,* 27 S. W. Rep. 1017; *Moranity v. Dailey,* 46 Conn. 592; *Davies v. Atkinson,* 124 Ill. 474; *Foundry Co. v. Wisdom,* 4 Lea 699; *Mills Co. v. McElwee,* 42 S. W. Rep. 465; *Germania Safety Co. v. Boynton,* 71 Fed. Rep. 797.

7.  The respondent is liable for the corporate funds transferred to him in payment for his stock, no matter who was the actual purchaser, because those funds were trust funds, which the *cestui que trust* and its creditors can follow into his hands. While it may be true that the trust fund doctrine no longer prevails in Alabama, it is, nevertheless, equally true that the directors shall officers of a corporation, here, as elsewhere, occupy a fiduciary relation towards the corporation and its stockholders and creditors, which is sufficiently similar to that of a trustee to make the general rules applicable to the one, applicable to the other also. Consequently, if these *quasi* trustees have been guilty of a misappropriation of that which has been committed to their trust, the quasi *cestui que trust* has the same right to follow the trust fund into the hands of its recipient, as he

[Hall & Farley, Trustees, v. Henderson;

Henderson v. Hall & Farley; Trustees.]

would have in the case of a regular trust.—*Evan. Synod v. Schoeneich*, 45 S. W. Rep. 647; *Snodgrass v. Moore*, 30 Mo. App. 232; *Clark v. Bank*, 57 Mo. App. 281; *Bank v. Sanford*, 62 Mo. App. 394; *Brick Co. v. Schoenicch*, 65 Mo. App. 283; *Leonard v. Latimer*, 67 Mo. App. 138; *Peak v. Ellicott*, 30 Kan. 156; *Thompson v. Savings Inst.* 8 Atl. 97; *Plow Co. v. Lamp*, 45 N. W. 1049.

8. The respondent is not entitled to the protection afforded a *bona fide* purchaser for value, no matter what view be taken of the facts. In the first place, the respondent is not entitled to the protection accorded to a *bona fide* purchaser for value without notice, because he had actual knowledge of the circumstances attending the transaction; or at least, if he had no such actual knowledge, he was chargeable with notice thereof from his official position, as has been shown above, as well as from the fact that he knew that corporate funds were used to some extent in payment for the stock purchased of him. —*Mills Manfg. Co. v. Whitehurst*, 72 Fed. Rep. 496; *Standish v. Babcock*, 29 Atl. Rep. 327; *McClellan v. Pyeatt*, 66 Fed. Rep. 843; *Nat. Express Co. v. Hough*, 3 Ohio St. 169; *Otis v. Otis*, 167 Mass. 245; *Shyrock v. Waggoner*, 28 Pa. St. 430; *Chesbrough v. Wright*, 41 Barb. 28; *Burtnett v. Bank*, 38 Mich. 630.

9. The respondent is liable for the conversion of the fifteen one thousand dollar bonds of the Alabama Midland Railway Company delivered to him by Woolfolk as collateral, and redelivered by him to Woolfolk. *Hill v. Campbell*, 74 N. W. Rep. 388; *McPartland v. Read*, 93 Mass. 231; *Edgerly v. Whalan*, 106 Mass. 307; *Lee v. Matthews*, 10 Ala. 682; *Gage v. Whittier*, 17 N. H. 312; *Kimball v. Billings*, 55 Me. 147; *McPheters v. Page*, 22 Atl. Rep. 101; 26 Amer. & Eng. Encyc. of Law, 742, n. 3; *Com. v. Tenney*, 97 Mass. 50; *Rice v. Yocum*, 155 Pa. St. 538.

10. The sole mission of Morris & Co. was to receive and collect for Henderson's account the check deposited to his credit by Woolfolk. Morris & Co. necessarily acted in making the collection as agent of the party for whose account the check was received, and whether by previous appointment or not, certainly so by ratifica-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

tion.—*Holloway v. Harper*, 108 Ala. 647; *Constant v. University, etc.*, 111 N. Y. 615-619; *Atlantic Mills v. Indian O. Mills*, 9 Am. St. Rep. 698; s. c. 147 Mass. 268; *LeNeve v. LeNeve*, 2 Lead. Cases in Eq. 38 and 66 to p 109; *Fishkill v. Nat. Bank*, 80 N. Y. 162; *Eastman v. Pro. M. R. Asso.*, 5 L. R. A. 712; *Honig v. Pac. Bank*, 15 Pac. 58; *Wood v. Rayburn*, 22 Pac. 526. The use of a common agent gives notice to each principal of what such agent learns in the transaction of the business.—*Bir. Trust. Co. v. La. N. Bank*, 99 Ala. 379; *Brown Bros. v. Brown*, 14 Atl. 417, and 19 Atl. 236; *Boyd v. Yerkes*, 25 Ill. App. 527. If a check is deposited for one's own credit, or for the credit of another, there is an implied, if there be no express, agency to collect.—1 Daniel on Neg. Instruments, § 324; *Hazlett v. Com. Nat. Bank*, 19 Atl. 55.

11. It is hardly worth while to do more than cite the authorities on the point that a check drawn officially on the account of the A. T. & I. Co. was notice to the taker of the fraud.—*Shaw v. Spencer*, 100 Mass. 382; *Wolff v. State*, 79 Ala. 201; *Nat. Bank v. Ins. Co.*, 104 U. S. 54. The transaction can only be viewed in one of two ways. The check was either received as cash from the depositor, and credited as such to Fox Henderson, thereby making Morris the agent of Henderson to collect and to hold for his account, and making Morris the debtor to Henderson from the moment of deposit.—*Wasson v. Lamb*, 6 L. R. A. 191; *Craiger v. Hadley*, 99 N. Y. 151.

HARMON, DENT & WEIL, A. A. WILEY and W. S. THORINGTON, *contra*.—When a bill is filed in the alternative, each alternative phase of the bill must state a good cause of action.—*Moore v. Alvis*, 54 Ala. 356; *Lucas v. Oliver*, 34 Ala. 626; *Davis v. Shepherd*, 40 Ala. 587; *Seals v. Robinson*, 75 Ala. 363; *Andrews v. McCoy*, 8 Ala. 920.

The bill was not amended so as to make its averments correspond with the evidence, and for the variance between the averments of the bill and the evidence, we think the bill should have been dismissed.—*Gilmer*

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

*v. Wallace*, 75 Ala. 220; *Meadors v. Askew*, 56 Ala. 584; *Floyd v. Ritter*, 56 Ala. 356; *Alexander v. Taylor*, 56 Ala. 491; *Ives v. Reese*, 65 Ala. 134.

It is a well settled rule of chancery practice that all of the complainants must recover or none can.—*Wilkins v. Judge*, 14 Ala. 135, 137; *Butler v. Gazzam*, 81 Ala. 491; *Ives v. Reese*, 65 Ala. 134.

Henderson received the checks for value, and unless he had notice or knowledge of the fact that it was the money of the A. T. & I. Co., paid to him on these checks, he is not liable. The question presented by the checks as to whether they were sufficient to charge Henderson with notice, has never been decided in this State.

In the case of *M. & M. Railway Co. v. Felrath*, 67 Ala. 189, the question was presented to this court on a check signed similar to these, but was not decided. These checks were not signed by the Alabama Terminal & Improvement Company, nor by any one purporting to sign them in the capacity of nor as an officer of said company in such manner as to bind it. The abbreviations "Prest." and "Vice-Prt.", following the names of Woolfolk and Dimmick, are merely *descriptio personae* and surplusage. They were *prima facie* the individual checks of the persons signing them, and not the checks of the Company.—Thompson on Corporations, § 5125; Morse on Banks & Banking, p. 292; Randolph on Commercial Paper, §§ 131, 133 and 137; *Tucker Mfg. Co. v. Fairbanks*, 98 Mass. 101; 1 Am. & Eng. Ency. of Law, (2d ed.), pp. 1043, 1046, 1053 and 1056. The decisions of the several States are cited in the notes; 48 Am. St. Rep. in note on pp. 917 and 918; Thompson on Corp. §§ 5129, 5137 and 5141. The decisions of our own Supreme Court are to the same effect.—*R. L. & M. Works v. Moragne*, 24 So. Rep. (Ala.), 834; *Drake v. Flewellen*, 33 Ala. 106; Mechem on Agency, § 438; *Castleberry v. Fennell*, 4 Ala. 642; *Tate v. Shackelford*, 24 Ala. 510; *Westmoreland v. Foster*, 60 Ala. 448.

It is manifest from all the authorities that where nothing appears in the face of the the note, bill or check, disclosing the principal, and only such words as

"Agent," "Trustee," "President," etc., are added to the signature, that such words are merely descriptive of the person; and in all of the cases on the subject where only this appears, the corporation will not be bound by the check or note in a suit on it, but in a suit against the signer he cannot defend by saying that he executed it by signing it for some one else.

The check being commercial paper, the question as to who is liable thereon as drawer, and in what capacity he is liable, must in all cases be determined from the instrument itself.—Morse on Banks and Banking (2d ed.), p. 292; Thompson on Corp. § 5126; *Tucker Mfg. Co. v. Fairbanks*, 98 Mass. 101; *Pentz v. Stanton*, 10 Wend. 276; *Stackpole v. Arnold*, 11 Mass. 27; 1 Am. & Eng. Ency. of Law (2d ed.), pp. 1051 to 1054 and note; *Robinson v. Kannawha Valley Bank*, 58 Am. Rep. 829 (44 Ohio St. 441); *Webster v. Wray*, 56 Am. Rep. 754, (19 Neb. 558); *Drake v. Flewellen*, 33 Ala. 106.

It is a well settled rule of law that where one of two innocent parties must suffer on account of the fraud or misconduct of a third person, that he who is negligent, or puts it in the power of the person perpetrating the fraud to commit wrong, must sustain the loss. In this case, if the Farley Bank had not paid these checks Henderson could have collected his money out of Woolfolk and Saportas—at least it is not made to appear to the contrary in the evidence in this case. He certainly would not have surrendered his notes, cancelled and delivered the securities held on them if these checks had been returned not paid by the Farley Bank, as it was their duty to do, unless they had an account on the books of the bank corresponding with the signatures on the checks—3 Brick. Dig. 448, § 30; Morse on Banks and Banking, (2d ed.), pp. 292-3; *Fryon v. Orby*, 3 G. Grani (Iowa) 289; *Ihl. v. Joseph Bank*, 26 Mo. App. 129; *Serrell v. Derbyshire R. R. Co.*, 9 C. B. 811; 19 L. J. C. P. 377; *Coote v. Bank*, 3 Cranch 50.

The answer in this case, filed May 15th, 1897, and refiled with the amendment April 16th, 1898, sets up as a defense that Henderson transferred his shares of stock to Woolfolk, and Woolfolk, for the company, trans-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

ferred the same to the Farley National Bank as collateral security for a part of the debt on which this suit is founded, and the Farley Bank transferred the same to the complainants in this case, and they now hold it, and have never returned, or offered to return said stock to Henderson or to Woolfolk, and that they had full knowledge of the facts at the time they received said stock, or that they have retained the same after obtaining full knowledge of all of the facts.

We think that the evidence proves this defense set up in the answer without conflict, and beyond question or doubt. The complainants are mere transferees of the Farley National Bank, and, at most, stand in the shoes of the bank. They certainly have no higher or better position than the bank would have if complainant in this suit.—*Sayre v. Weil*, 94 Ala. 466; *Walker v. Miller*, 11 Ala. 1067; *Grangers H. & L. Ins. Co. v. Kamper*, 73 Ala. 346; *Haywood v. Andrews*, 106 U. S. 672.

Under the facts in this case the law will not charge Henderson with constructive notice of the diversion or misappropriation of the funds of the company by Woolfolk, upon the ground that Henderson was treasurer and one of the directors of the company. He is no more chargeable with notice of Woolfolk's management and conduct of the affairs of the company than any other director of the company. Nor is he chargeable with constructive notice of the entries on the books of the company, any more than any other director or stockholder in the company; and the stockholders of a corporation in a suit like this, occupy a similar relation to the books and accounts of the corporation and the use of its funds, except so far as they are shown to have knowledge or connection with them, to a stranger. This whole question concerning the books, and the question of notice by reason of being an officer of the corporation is so fully and clearly discussed in the case of *Rudd v. Robinson*, 22 Am. St. Rep. 816, and authorities in the note at end of decision, (126 N. Y. 113), that it settles the matter.—See also *Haynes v. Brown*, 36 N. H. 567, 568; *Powell v. Canover*, 75 Hun. 11; *Lehman v. Canover*, 75 Hun. 11; *Lehman v. Glynn*, 87 Ala. 627;

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

*v. Glynn*, 87 Ala. 627; Thompson on Corporations, § 4715.

A court of equity will not permit complainants to have a judgment in this case against Henderson, and force Henderson to his suit against the Farley National Bank to recover the damage sustained from the misconduct as his agent in the collection of the notes. *Thames v. Rembert*, 61 Ala. 345; *Lee v. Mathews*, 10 Ala. 682; *Sayre v. Weil*, 94 Ala. 475.

The Farley National Bank did not notify Henderson that the money collected on the two notes of Woolfolk and Saportas by it for Henderson were collected out of the moneys or funds of the Alabama Terminal & Improvement Company; and upon receipt of said checks they surrendered the notes cancelled, together with the order for the securities. This was a payment of the notes in such manner that it released Woolfolk and Saportas from liability to Henderson.—Morse on Banks and Banking, § 214; *Smith v. Essex County Bank*, 22 Barb. 627. See also Bigelow on Estoppel (6 ed.), p. 586 and note; 7 Am. & Eng. Ency. of Law, p. 22.

TYSON, J.—We shall first dispose of the questions raised by the assignments of error on the cross-appeal.

When this case was here on former appeal (114 Ala. 601) the equities of the bill were fully discussed and settled. In the opinion delivered, the averments of the bill are set out *in extenso* and the two theories under which relief is sought are pointed out and shown not to be inconsistent or repugnant, the one with the other. The purpose of the bill under the second or alternative aspect presented in it, is to seek satisfaction of the complainants' demand out of the debtor's property, which is alleged in effect to have been fraudulently conveyed or attempted to be placed beyond the reach of execution. Or to state the proposition in another form, it is to subject to the satisfaction of complainants' debt equitable assets in the hands of Henderson which have been converted by him. For if it be true as averred that Woolfolk and Saportas as officers of the corporation, the A. T. & I. Co., purchased the stock of Hender-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

son in that corporation for that company and Hender-
son was paid for it out of the assets of the corporation,
with notice, though perhaps binding *inter partes*, which
however we do not here decide, it is very certain that
it was voidable at the instance of creditors of the cor-
poration, as a fraud upon them, if the corporation's
ability to pay its debt was impaired by the transaction.
This is not upon the principle that the assets of a cor-
poration are trust funds to be held by it as a trustee
for the benefit of its creditors, but is rested upon the
doctrine that it is a voluntary conveyance or transfer
as against creditors by the corporation to its stock-
holders of its assets. A business corporation primarily
has no assets other than those which it derives from the
subscription to its capital stock. In organizing it and
subscribing for shares of stock, the stockholder ac-
quires simply "a right to participate according to the
amount of his stock in the surplus profits of the cor-
poration on a division, and ultimately on its dissolu-
tion, in the assets remaining after payment of its
debts."—Cook on Stock and Stockholders and Corp.
Law, § 5 and note 1. A stockholder has no right to
demand that the corporation pay to him the value of
his stock, nor has the corporation any legal right to
do so as against creditors. Its obligation to redeem
its stock can never arise until dissolution and, even
then, it is subordinate to its obligation to pay its cred-
itors. To permit a corporation to purchase without
restriction shares of stock issued by it, would in effect
license stockholders by resorting to sales of their shares
to it to deplete the assets of the corporation, and give
to them a preference over creditors, which was never
contemplated, and to confer upon them a right which
they never contracted for, and to which they were not
entitled when they made the contract by which they
became the owners of their shares, nor at the time the
creditor extended to the corporation. A permissive
recognition of the unrestricted right of a corporation to
purchase the shares of one of its stockholders, as against
creditors, necessarily concedes the same right to the cor-
poration to purchase the entire capital stock. If this

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall &,Farley, Trustees.]

right be accorded a corporation and it is exercised to its full limit, we would have the case of a corporation having distributed its entire capital to its stockholders, leaving it as the owner if its own promises obligatory with which to pay its debts to its creditors. Of these, it would seem, the creditors had a sufficiency. At least, more promises made to the creditors would add no value to those already held by them. Indeed, an examination of the general statutes on the subject of creating corporations and regulating their organization will disclose that they require a certain *per centum* of the proposed capital stock to be paid by the subscribers and their written obligation executed and delivered to some one for the balance of their subscription, usually denominated commissioners, before a charter is granted. See Chapter 28 of Code. Distinctly showing that their policy is that no fictitious corcorporations shall exist in this State. That when a corporation is organized and authorized to do business under our laws, those who deal with it may do so upon the assurance that its capital has been either fully paid up or the corporation has the written obligation of its subscribers as assets, out of which the money due to it by them may be realized. To say that these subscribers, after paying up their subscription obligations, may make a sale of their stock to the corporation and withdraw the money paid by them to the corporation would not only be a fraud upon the creditors of the corporation, but upon the law. Of course, should such a course be adopted by the unanimous consent of all the stockholders and there are no creditors, there would be no one to complain.

We are aware that the courts of this country are divided upon the question as to the power of corporations to acquire and hold its own stock. But in no jurisdiction is the power of a corporation to purchase its own shares sustained, if the purchase is made with the intent to injure its creditors or to defeat them in the collection of their claims or if it has such effect. 7 Am. & Eng. Ency. Law, pp. 818, 819, 820, and notes.

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

We have said this much on the subject of the power of corporations to acquire and hold their own stock in order that we may clearly have in mind the scope of the bill and in order that we may deal intelligently with the issues tendered by its averments.

We have made no mention of the first theory presented by the bill based upon the averment that Henderson has not paid his subscription note executed by him to the A. T. & I. Company for stock. This is unsupported by the testimony in the case and is not insisted upon as a ground for relief.

After the cause was reversed on the former appeal, the bill was amended by incorporating into it the averment that the complainants became the owners of the debt held by the Farley National Bank against the A. T. & I. Company with the right to collect the same for the benefit of the stockholders of said bank and also, by making H. M. Hall a party complainant in whose name the indebtedness of the bank against the A. T. & I. Co. was reduced to judgment. After these amendments were made, a number of grounds of demurrer was assigned to the bill as amended. It is argued in support of the 6th and 7th grounds that the judgment in favor of Hall as receiver is a nullity because the averments of the bill show his discharge as receiver before the rendition of the judgment and the assets of the bank returned to it and transferred to the other complainants, Hall and Farley as trustees. The argument is that the suit in which the judgment was recovered, abated, by reason of Hall's discharge as receiver, and therefore the judgment was void. The insistence is that section 26 of the Code requires all suits to be prosecuted in the name of the parties really interested. But the exception made by the statute is that in actions upon bills of exchange and promissory notes payable at a bank or banking house or at a designated place and other commercial instruments, the suit must be instituted in the name of the person having the legal title. We will presume in support of the judgment that such was the character of the instrument sued upon and evinced the debt for which the judgment was ren-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

dered. If Hall had not the right or capacity to maintain the suit, the defendant corporation should have availed itself of it by proper defenses. It is certainly not void on its face and, therefore, not open to an attack collaterally.

The case of *Rice v. Rice,* 106 Ala. 636, answers the contention made in support of the 8th, 9th, and 10th grounds of the demurrer, that the *cestui que trust* of Hall and Farley as trustees should be parties to this cause.

The making of H. M. Hall a party complainant, relieved the necessity of any averment of a formal transfer or assignment of the judgment or proof of such assignment or transfer. Nor did it bring the case within the application of the general doctrine that all complainants must recover or none can. These principles are settled in the following cases: *Gunter v. Williams,* 40 Ala. 572; *Blevins v. Buck,* 26 Ala. 292; *Plowman v. Riddle,* 14 Ala. 169; *McLane v. McLane,* 19 Ala. 180, and it will serve no purpose to discuss them at length. This disposes of the 11th and 12th and 1st grounds of demurrer to the bill as amended by making Hall a party.

It is stated, in brief, in support of the first, second, third and fourth grounds of demurrer to the alternative phase of the bill, that they, should be sustained because the averments of the bill are too indefinite and uncertain, in that it fails to show when the assets were received by Henderson, what the assets consisted in, how they were received, whether as director and treasurer of the company in his official capacity, or whether in his individual capacity and whether all were received at one time or at different times. These are matters peculiarly within the knowledge of the A. T. & I. Co. and Henderson, the respondents to the bill. We do not understand it to be a rule of pleading that the evidential facts upon which the pleader relies shall be set forth in his pleading. The charge is, that Henderson, subsequent to January 5, 1891, being a director and treasurer of the company, received assets of said company amounting to $30,000 or other large sum,

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

knowingly and without proper and legal consideration to said company, which he is liable for with interest. The preceding averments of the bill sufficiently disclose the relations of all the parties to each other, the liability of Henderson to the company in the sum of $30,000 on account of his subscription for stock, the sale of the stock by him either directly to the company or indirectly to it through Woolfolk and Saportas. And, indeed, a liability on the part of Henderson in receiving the assets of the corporation in payment for his stock. It is manifest from this statement that there is no merit in these grounds of demurrer.

The fact of the insolvency of the Alabama Terminal & Improvement Co. is sufficiently proven by the evidence. But this fact is immaterial under the view we take of this case. For if it be true that Henderson received the assets of the corporation knowingly or under such circumstances as to put him upon inquiry that the money paid to him for his stock was the money of the corporation in consideration of a sale by him of the stock to the corporation direct, or through Woolfolk and Saportas to the corporation, or if the consideration enuring to the corporation was his stock, then it is in effect a gift by the corporation to him of its assets, which is fraudulent as to creditors whether the corporation was actually insolvent at the time the bargain for the sale of the stock was made or not. There can be little doubt, if that were important, that it was on the road to financial disaster when the alleged sale was made and was hopelessly insolvent long before Henderson received many of the payments made to him. Morawetz on Corporations, § § 793, 794. Nor do we understand the fact to be controverted that all the money Henderson received on account of his alleged sale of the stock was paid out of the assets of the corporation. There is no room under the evidence for such a disputation, for it points with unerring certainty to this conclusion.

The chancellor rendered a decree against Henderson for $8,719.61 and interest, and refused to charge him with the other money, assets of the corporation, received by him. In dealing with Henderson's liability, he

[Hall & Farley, Trustees, v. Henderson;

Henderson v. Hall & Farley, Trustees.]

did so as though Henderson had no connection with the company as director and as its treasurer. He bases his decree upon the proposition that the checks evidencing the various sums which aggregate the $8,719.61, gave actual notice to Henderson that he was receiving assets of the corporation. The contention of Henderson's counsel is that in this there was error. A long and ingenious argument is made to show that many of these checks were drawn by Woolfolk and others as individuals, and were not binding obligations upon the A. T. & I. Co., and therefore they were insufficient to convey notice to Henderson that he was receiving money belonging to the corporation, and not to those persons whose names appeared as drawers. It is is sufficient answer to all this to say that these checks were paid out of the funds belonging to the company, and that they bore on their face the appearance of being drawn by officers or agents of some principal upon a deposit, not the money of the agents, but of their principal. A number of them were signed "J. W. Woolfolk, Prest." and others were signed "J. W. Dimmick, Vice-Prest." Each of these named persons were officers of the A. T. & I. Co., which was correctly designated by the words following their respective names. As a director and officer of the same corporation, Henderson was bound to know and did know that they were acting in that capacity in signing these checks. These *indicia* on the checks, had he heeded the inquiry which they naturally suggested, would have led him upon investigation to a knowledge that it was funds of the corporation upon which they were drawn, and out of which he was being paid for his stock, which he says he sold to Woolfolk and Saportas. *Wolffe v. The State*, 79 Ala. 206, and authorities there cited.

The remaining contention made by Henderson, the cross-appellant, is predicted upon an estoppel which is alleged in his answer and which he insists is supported by the proof in the cause. We quote from his counsel's brief as showing what defense is alleged in the answer: "The answer in this case, filed May 15th, 1897, and refiled with the amendment April 16, 1898, in the sixth paragraph on page 6, sets up as a defense that Hender-

son transferred his shares of stock to Woolfolk, and Woolfolk, for the company, transferred the same to the Farley National Bank as collateral security for a part of the debt on which this suit is founded, and the Farley National Bank transferred the same to the. complainants in this case, and that they hold it, and have never returned or offered to return said stock to Henderson or to Woolfolk, and that they had full knowledge of the facts at the time they received said stock, or that they have retained the same after obtaining full knowledge of all of the facts."

If we treat the insistence as laid in argument, that the proofs sustains the averments of the answer, the whole matter might be disposed of by pointing out the fact that the evidence shows that this stock stands in the name of one John W. Hess, and has never, as a matter of fact, been transferred to these complainants. True the assignment to Hall and Farley as trustees shows 400 shares of stock is embraced in it. But the record shows that the corporation had purchased quite a large amount of its stock from other stockholders. Whether this 400 shares mentioned in the assignment is the stock bought of Henderson or the other Troy stockholders, does not clearly appear from the evidence. But aside from this, in the transaction between Henderson and Woolfolk, which is shown to have taken place about March 13, 1891, by which this stock was surrendered by Henderson to Woolfolk, Henderson got in lieu of it bonds as collateral security. The bank is not shown to have been a party to the negotiations between them which resulted in this exchange of securities, or to have had anything whatever to do with it, except to become the transferee solely for the purpose of becoming a conduit by which the Chatham National Bank of New York city might become its owner as the property of Woolfolk. This purpose is clearly disclosed in Woolfolk's letter to Henderson. But conceding that the Chatham National Bank desired, and held this stock as collateral security for an indebtedness due it by the Farley Bank, we can perceive no injury to Henderson on that account. He received a *quid pro quo* from Woolfolk for the stock he surrendered. If he after-

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

wards surrendered the bonds to Woolfolk, which he got in lieu of the stock, it is not shown that the Farley Bank by any representation or by any act upon which he relied, induced him to do so. If Woolfolk got the better of him in the exchange of securities, no complaint is made of it in the pleadings or the evidence. Furthermore, as we have said, the bank is not shown to have induced him in any way to make the exchange, or to have derived title to the stock from him.

It is further argued in support of the proposition that the averments of the answer are proven by these facts, viz., that on March 23, 1891, Henderson sent to the Farley Bank a note of Woolfolk to him in the sum of $3,333.33 for collection, and on May 1 a similar note for $4,000 for the same purpose, which were paid by checks drawn by Woolfolk on that bank, signed by him as "President." The evidence discloses that the consideration of these notes which were ostensibly given, along with others, by Woolfolk and Saportas, was for the purchase of Henderson's stock in the corporation. However, there was nothing on their face indicating this. It is true the bank undertook their collection and that on presentation of them by it to Woolfolk, he gave checks on it signed by him "President," which were paid by the bank, and the amounts remitted to Henderson. Confessedly all this does not, in the remotest degree, tend to prove that the stock was transferred to the bank, or that the bank transferred the stock to the complainants, as averred in the answer.

But it is said that the bank, by honoring these checks out of the deposits of the A. T. & I. Co. in payment of notes which showed on their face that they were the individual indebtedness of Woolfolk and Saportas, committed a wrong upon Henderson. This wrong consisted in not informing Henderson that Woolfolk was paying his debt to him out of the funds of the corporation and not his own. How did the bank know that Woolfolk was misappropriating trust funds? If it can be charged with such knowledge, it must be made to rest upon the fact that the checks were signed "Woolfolk, President,"—a strange and anomalous position for Henderson to assume. He had, prior to this time,

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

received more than $10,000 upon the sale of his stock, and every dollar of it was money belonging to the corporation. He had himself received checks signed in the same way which he collected and appropriated; and he prosecutes this appeal asserting as one of his grievances that the checks which he received did not carry notice to him that Woolfolk was using funds of the corporation. Had the bank notified him that it had declined to receive the checks from Woolfolk, it is evident he would have instructed it to do so. Or had the bank informed him that it had accepted the checks, it is very evident, judging from his conduct prior to that time and afterwards, that he would not have repudiated the transaction. But the bank was under no such duty to him. It was simply under the duty to present the notes for payment, receive the money and remit it to him. This it did. The deposits of the A. T. & I. Co. with it was the money of the corporation, and not his. Whatever may have been its duty to that company with respect to paying these checks, it is a matter of no concern to Henderson. He is not asserting his claim in privity of right or interest through it. On the contrary, he is asserting that he received no money which belonged to the company—positively denying its title to the money received by him.

Nor are the complainants' rights under the aspect of the bill under consideration, dependent upon the right of the corporation to assert its title to this money. The transaction, as we have shown, was fraudulent as against these complainants. Being fraudulent, their rights to subject their debtor's property fraudulently conveyed is in nowise dependent upon the right of their debtor to recover the money of Henderson.

Upon what principle an estoppel could be said to rest as to the money of the corporation received by Henderson, other than the two sums collected for him by the bank, so as to preclude the rights of these complainants, even if it be conceded that the bank owed Henderson the duty to notify him that Woolfolk had offered to pay these notes by checks drawn on the deposits with it belonging to the corporation, we are unable to see. Certainly not upon the doctrine of ratification. The bank

490        SUPREME COURT        [Nov. Term,

is not shown to have had any knowledge that Henderson had made the sale of its stock to the corporation, nor is it shown inferentially or otherwise that it knew that Henderson had been paid more than $10,000 of the corporation's funds by Woolfolk prior to March 23, the date of the collection of the first note by it; and certainly its conduct with respect to receiving these checks, had no influence upon Henderson by way of inducing him afterwards to receive from Woolfolk money belonging to the corporation in payment of other notes maturing later. As to payments subsequently made to him, the doctrine of ratification certainly has no application. It is not asserted in the pleadings, that as to the two items collected by the bank, that there is an estoppel. The defense, if it can be said to be asserted at all in the answer, goes to the entire bill, and in bar of all the relief sought under it. Care, however, being taken not to confess the cause of action as laid in the bill, but on the contrary, to deny it; yet, in argument, it is insisted, notwithstanding Henderson's refusal to confess, that he should have the benefit of his avoidance of liability—a benefit entitled to be invoked only by those who are willing to and do confess and seek to avoid by proper averments in their pleadings. An estoppel *in pais,* in general, must be pleaded, and the facts supporting it must be clearly made out by the party relying upon it. Estoppels never arise from ambiguous facts, but must be established by such as are unequivocal and not susceptible of two constructions. An estoppel must not rest in mere inference or argument, but must be a precise affirmation of that which makes it.—8 Encyc. Pl. & Pr. p. 10 and notes.

It follows from what we have said that Henderson takes nothing by his appeal.

Of the $29,102.57 of the A. T. & I. Co.'s money received by Henderson in payment for his stock, the learned judge in the court below only charged him, as we have said, with $8,719.61, and refused to charge him with the following items: $2,500 paid February 24, 1891; $7,530 paid on the same day; $3,342.96 paid March 23; $4,010 paid May 1; and $3,000 paid June 6, aggregating the sum of $20,382.96. From a reading of his

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

opinion it is manifest that he regarded the sale of the stock as one to Woolfolk and Saportas and not to the corporation, and that he gave little or no weight to the entries upon the books of the corporation introduced in evidence. His reason for his refusal to charge Henderson with these sums is put upon the ground that the evidence is insufficient to put Henderson on notice that these sums were moneys of the corporation. Was the sale of the stock by Henderson to Woolfolk and Saportas a *bona fide* one to them? Or was the taking of their notes a mere device to cover up a sale by him to the corporation? In solving these questions, it will be well to bear in mind the relation of these parties to the corporation; the known opposition of Henderson and other Troy stockholders to the project of Woolfolk to construct the M. T. & M. Railroad out of the funds belonging to the A. T. & I. Co.; the kiting operations indulged in by Woolfolk as president of the A. T. & I. Co. by which that company was enabled to get credit from the Farley Bank for an enormous sum of money; the valuable aid rendered by Henderson to Woolfolk in consummating these kiting operations by accepting as treasurer hundreds of drafts drawn on him as such for large amounts, which were discounted by the Farley Bank, when he had not one dollar in his possession belonging to the company; notwithstanding Henderson's claim to have been only nominally performing the function of his office as treasurer of the corporation at a salary of $900 per annum; the absolute want of any necessity for the drawing of these drafts in due course of business, as Woolfolk was clothed with full power to check upon any depository in which the corporation had funds, without Henderson's consent; the failure of Henderson to make known to the business world, and especially to the Farley Bank, whom he knew was discounting Woolfolk's drafts upon him, that he had no funds as treasurer subject to draft, and that he was simply filling the office in a perfunctory way to accommodate Woolfolk. Also to bear in mind the further fact that Henderson accepted money in part payment of his alleged debt against Woolfolk and Saportas, known to him to be funds belonging to the corporation

of which he was a director and its treasurer, whose duty as an officer required him to protect its assets agaist the spoliations of Woolfolk; and the fact that Woolfolk and Saportas were insolvent, especially the former, who had been since the organization of the company its debtor in a large sum on account of stock subscriptions, which he never paid. But these facts are not all which legitimately tend strongly to show that the stock was sold by Henderson to the company, and not to Woolfolk and Saportas, and that he knew he was receiving money belonging to the company in payment of their alleged indebtedness to him. The most potent probative evidence tending to establish a sale by Henderson to the corporation and a knowledge by him that he was being paid out of its assets is to be found in the books of the corporation—entries upon the cash book of the company. We repeat, the most potent probative evidence tending to establish these facts are to be found in these books, for the reason that if the facts disclosed by them stood alone, in connection with the admitted fact that Henderson was a director and treasurer of the corporation at the time the entries were made, the facts as disclosed by those entries would have made at least a *prima facie* sale by him to the corporation of the stock, and of course notice to him that he was receiving assets of the company, his vendee, in payment for it.

The entries upon the cash book disclose "Bills payable January 5th, 1891: 3 notes account of A. C. Saportas and J. W. Woolfolk *for the A. T. & I. Co.* for $10,000, each due as follows:

One note 30 days after date................$10,000
One note 45 days after date............... 10,000
One note 60 days after date............... 10,000
                                          ─────────
                                          $30,000

On credit side of cash book:
Investment account—
Bought of Fox Henderson 3,000 shares capital
   stock of A. T. & I. Co.:
In suspense...............................$30,000

[Hall & Farley, Trustees, ♱. Henderson;
Henderson v. Hall & Farley, Trustees.]

A. record of the renewal and extension notes execut-
ed by Woolfolk and Saportas, as well as all payments
made by the corporation to Henderson, appear in the
entries upon this cash book. Henderson says, to all
this, that he did not keep this book, and had no knowl-
edge of its contents. It was presumptively his duty as
treasurer to have kept this book or to have some one to
do so for him. He cannot, under the facts of this case,
avoid as against creditors of the corporation, the pro-
bative effect of these entries by invoking his own dere-
liction of duty. Especially is this true, when taken in
connection with the fact that he was accepting drafts
drawn upon him as treasurer, known by him to have
been discounted upon the faith of his acceptance of
them, and that he had funds of the corporation with
which to pay them. The doctrine is stated by Thomp-
son on Corporations, section 5308, to be: "It is a sound
view, at least in so far as the question respects the rights
of *third parties*, that the directors of a corporation are
in law conclusively presumed to know its condition,
its business, its receipts and expenditures, and all the
general facts which go to make up that condition and
business, as shown by the entries on its regular books.
The reason for this is that it is *their duty* to know
these things in the exercise of their official functions.
This doctrine is said to be one founded in *public policy,*
essential to the safety of third parties in their dealings
with corporations, and to the protection of the stock-
holders interested in the welfare and safe management
of corporations."

Justice Brewer, now of the Supreme Court of the
United States, while a member of the Supreme Court
of Kansas, in the case of *National Bank v. Drake,* 29
Kan. 326, said: "The directory, as has been said, is the
visible representative of the bank. Persons dealing
with it meet only this visible representative, and have
a right to presume that it knows all of the affairs of the
bank, all that the bank as a principal ought to know of
its condition and business. On the other hand, the
stockholders and depositors—the persons who are pe-
cuniarily interested in the safe management and pros-
perity of the bank—look to the directors as the chosen

guardians of their interests, and have a right to demand of them that they watch over all those interests in their minute details. So that all of these parties have a right to assume that the directors know all the transactions, business and condition of the bank; because they ought to know them, and because otherwise they do not discharge their full duties to these various parties."

The case of *United Society v. Underwood,* 9 Bush, 609, was several actions of trover brought to recover of directors of an insolvent bank by those who had placed certain bonds in the custody of the bank, on naked bailment, as a special deposit. The declarations charged that the bonds so deposited had been converted to the use and emolument of the bank; that they had been abstracted from the package of special deposit by officers of the bank, and sold, and the proceeds used in the business of the bank; that the defendants, being directors, had notice of the fact of such conversion, or could by the most ordinary diligence, have had notice, as well from the ledgers, books and accounts of the bank as from its correspondence, etc. To the declarations a demurrer was sustained by the lower court. The Supreme Court, reversing the rulings of the lower court, said: "Bank directors are not mere agents, like cashiers, tellers, and clerks. They are trustees for the stockholders; and as to their dealing with the bank, they not only act for it and in its name, but, in a qualified sense, are the bank itself. It is the duty of the board to exercise a general supervision over the affairs of the bank, and to direct and control the action of its subordinate officers in all important transactions. The community have the right to assume that the directory does its duty, and to hold them personally liable for neglecting it. Their contract is not alone with the bank. They invite the public to deal with the corporation, and when any one accepts their invitation he has the right to expect reasonable diligence and good faith at their hands; and if they fail in either they violate a duty they owe not only to the stockholders, but to the creditors and patrons of the corporation.—*Hodges v. New England Screw Co.,* 1 R. I. 312. * * * It is

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

further objection that the allegation of notice is so far qualified as to render insufficient the averment of its existence. It is stated that appellees 'and each of them, had, or could have had by the use of the most ordinary diligence and investigation, ample notice.' It is also alleged by Davenport that they each 'had notice as well from the ledgers, books and accounts of said bank as from its correspondence, reconcilements and statements.' It is the duty of bank directors to use· ordinary diligence to acquaint themselves with the business of the bank, and whatever information might be acquired by ordinary attention to their duties, they may, in controveries with persons transacting business· with the bank, be presumed to have. They can not be· heard to say that they were not apprised of facts shown to exist by the ledgers, books, accounts, correspondence,. reconcilements, and statements of the bank, and which would have come to their knowledge except for their gross neglect or inattention. It is not necessary in many cases to show directly that the directors actually had their attention called to the mismanagement of the affairs of the bank, or the misconduct of the subordinate officers. It is sufficient to show that the evidences of the mismanagement or misconduct were such that it must have been brought to their knowledge unless they were grossly negligent or willfully careless in the· discharge of their duties. If it shall turn out upon the· trial of these actions that the ledgers, books, etc., of the bank showed that the special deposits of these appellants were being sold, and that this fact would have· been discovered by appellees by the use of ordinary diligence, then the presumption of actual knowledge will arise. It follows, therefore, that the allegation of notice is sufficient."

These principles are also declared in *Martin v. Webb*, 110 U. S. 7; *Merchants' Bank of Lincoln v. Rudulf*, 5 Neb. 527; *Bank of Wulfckuhlch*, 19 Kan. 527; *Arlington v. Peirce*, 122 Mass. 270; *Bank v. Dandridge*, 12· Wheat. 64.

The competency of the entries in the books as evidence against a director is recognized, though the presumption raised is not held to be conclusive or indis--

[Lagarde *et al.* v. Anniston Lime & Stone Co.]

putable, in *Merchants' Bank v. Taylor*, 21 Ga. 334; *Hubbard v. Weare*, 79 Iowa, 678; *First Nat. Bank v. Tisdale*, 84 N. Y. 655; *Huntington v. Attrill*, 118 N. Y. 365; *Bedford v. Sherman*, 68 Hun. 317; *Spellier Electric Time Co. v. Geiger*, 147 Pa. 399; *Olney v. Chadsey*, 7 R. I. 224; *Lane v. Bank of West Tenn.*, 9 Heisk. 419.

Under the facts of this case, it is unnecessary to go to the length of holding the presumption raised against Henderson, conclusive. According to these entries, the force of a disputable presumption of the truth of the facts stated in them, when taken and weighed in connection with the facts we have pointed out above, as shown outside of the book entries, our conclusion is, that Henderson's statement, and that of Woolfolk's, that the stock was sold to Woolfolk and Saportas, and not to the corporation, is insufficient to overcome their probative effect. The sale being to the corporation, it follows as a matter of course, that Henderson knew that he was being paid by it, his vendee.

A decree will be here entered affirming the decree upon the appeal prosecuted by Henderson, and reversing the decree upon the appeal of Hall and Farley. A decree will also be here rendered in favor of Hall and Farley as trustees for all the money paid to Henderson on account of this sale.